### SPRING VALLEY WATER CO. v. CITY AND COUNTY OF SAN FRANCISCO et al.

#### (Circuit Court, N. D. California. October 7, 1908.)

1. CONSTITUTIONAL LAW (§ 277*)—DUE PROCESS OF LAW—SUBJECTS OF PROTECTION—"LIFE, LIBERTY AND PROPERTY."

   The terms "life, liberty and property," as used in the fourteenth constitutional amendment, embrace every right which the law protects; they include not only the right to own and hold, but also to use, property, and profits and income are within the protection of the amendment, subject, however, to the rule that when property is devoted to a public use the owner is entitled to earn only such income therefrom as is just and reasonable as between him and the public.

   [Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 277 * For other definitions, see Words and Phrases, vol. 5, pp. 4156, 4157.]

2. COURTS (§ 282*)—UNITED STATES COURTS—CONSTITUTIONAL QUESTIONS—DUE PROCESS OF LAW.

   The question whether rates fixed by a municipal body to be charged by a water company are just and reasonable, or confiscatory and unconstitutional, is a judicial one, for the determination of which the company has the right to invoke the jurisdiction of a federal court.

   [Ed. Note.—For other cases, see Courts, Dec. Dig. § 282.*]

3. CONSTITUTIONAL LAW (§ 47*)—DUE PROCESS OF LAW—REGULATION OF WATER RATES.

   Such an action, however, is not one to review the action of the municipal body, and the evidence upon which it acted, its motives and methods of procedure, are immaterial on the question of granting a preliminary or permanent injunction to restrain enforcement of its rates, the only question being whether or not as a whole they are confiscatory, which is to be determined by the court from an independent investigation of the facts.

   [Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 47.*]

4. WATERS AND WATER COURSES (§ 203*)—WATER COMPANIES—REASONABLENESS OF RATES.

   The fact that interest rates generally have advanced within a short time does not necessarily entitle a water company to earn a higher rate of income than before without a corresponding adjustment of the value of its property.

   [Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 292-294; Dec. Dig. § 203.*]

5. WATERS AND WATER COURSES (§ 203*)—WATER COMPANIES—REASONABLENESS OF RATES.

   Rates of charge fixed for a water company which will enable it to earn an income of 5 per cent. net on the value of its property after all

---

taxes, operating expenses, and other legitimate and proper charges are deducted from the gross income are neither unreasonable nor confiscatory.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 292–294; Dec. Dig. § 203.*]

6. WATERS AND WATER COURSES (§ 203*)—WATER COMPANIES—REASONABLE-NESS OF RATES.

While in determining the reasonable value of the property and plant of a water company the estimated cost of a substitute system may be considered, it cannot be a controlling element.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 292–294; Dec. Dig. § 203.*]

7 WATERS AND WATER COURSES (§ 203*)—WATER COMPANIES—REGULATION OF RATES—VALUATION OF PROPERTY—"PROPERTY."

The franchise of a water company to collect rates for water is property, and its value, as well as whatever value attaches to its business as a going concern, is to be considered in determining the value of its property for rate-fixing purposes, but the burden of proving such values rests upon the company.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 292–294; Dec. Dig. § 203.*

For other definitions, see Words and Phrases, vol. 6, pp. 5693–5728; vol. 8, pp. 7768–7770.]

8. WATERS AND WATER COURSES (§ 203*)—WATER COMPANIES—REGULATION OF RATES—VALUATION OF PROPERTY.

In determining the value of the property of a water company for rate-fixing purposes, only such property as is at the time actually in use for supplying the water to which the rates apply, and necessary for such use, is to be taken into account, and it is to be valued at what it is worth for such purpose.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 292–294; Dec. Dig. § 203.*]

9 WATERS AND WATER COURSES (§ 203*)—WATER COMPANIES—REGULATION OF RATES—VALUATION OF PROPERTY.

In ascertaining the value of the property of a water company for rate-fixing purposes, the market value of its outstanding stock and bonds may properly be considered and given the weight to which it appears to be entitled.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 292–294; Dec Dig. § 203.*]

10. WATERS AND WATER COURSES (§ 203*)—WATER COMPANIES—REGULATION OF RATES—REASONABLENESS OF RATES.

A water company is not entitled to charge to its current expense account for rate-fixing purposes the cost of replacing property destroyed through its own fault or negligence.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 292–294; Dec. Dig. § 203.*]

11. WATERS AND WATER COURSES (§ 203*)—WATER COMPANIES—REGULATION OF RATES—REASONABLENESS OF RATES.

In fixing reasonable and just rates to be charged for water by a water company, the depreciation of its plant from natural causes resulting from use should be taken into account, and the cost of replacement provided for out of the gross income.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 292–294; Dec. Dig. § 203.*]

12. INJUNCTION (§ 136*)—PRELIMINARY INJUNCTION—CONDITIONS—DISCRETION OF COURT.

Under the Constitution of California the board of supervisors of the city and county of San Francisco is required to annually fix the rates

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

to be charged for water by any water company for the ensuing year. Complainant water company, which supplied water to the city and its inhabitants, brought suit to enjoin the enforcement of the ordinance fixing the rates for a certain year, which were slightly higher than those which had been accepted and charged by the company for a number of preceding years, but in the meantime taxes and operating expenses had increased so that its net income had substantially decreased. On the showing made it appeared probable that the rates made by the ordinance were so low as to be unreasonable and confiscatory under the changed conditions. *Held,* that complainant was not estopped by its acquiescence to maintain the suit, but that the court in the exercise of its discretion would grant a preliminary injunction restraining the enforcement of the ordinance rate only on condition that any amount collected in excess of that rate be impounded to abide the final order of the court.

[Ed. Note.—For other cases, see Injunction, Dec. Dig. § 136.*]

In Equity. On motion for preliminary injunction.

Heller, Powers & Ehrman and Page, McCutchen & Knight, for complainant.

Percy V. Long, City Atty., and Thomas E. Haven and W. H. Smith, Jr., Asst. City Attys., for defendants.

Edward Robeson Taylor, amicus curiæ.

FARRINGTON, District Judge. Under the provisions of the Constitution of the state of California, art. 14, § 1, it is the duty of the board of supervisors of the city and county of San Francisco in the month of February of each year to fix the rates or compensation to be collected by any person, company, or corporation for the use of water to be supplied to that city and county and to its inhabitants during the year commencing on the 1st day of July thereafter. The Constitution declares that the ordinance by which such rates are so established "shall continue in force one year, and no longer * * *. Any person, company, or corporation collecting water-rates * * * otherwise than as so established, shall forfeit" its "franchise and waterworks * * * to the city and county * * * for the public use."

The water rates so fixed by municipal ordinance of February, 1902, have prevailed, and have been collected by the Spring Valley Water Company, and by its predecessor, the Spring Valley Waterworks, from July 1, 1902, until the beginning of the present suit. Each year the board of supervisors has adopted a new ordinance, and in each of these enactments, except the ordinance of 1908, the rates were substantially less than the rates of 1902; but, with equal regularity, except in 1906, the water company has brought suit against the city and county of San Francisco, and the enforcement of each ordinance has been stayed by interlocutory injunction issued out of this court. Suit was brought in 1902 to restrain the enforcement of the municipal enactment of that year on the ground that the rates then established were so low as to be practically confiscatory. That suit was voluntarily dismissed by the complainant. The suits for 1903, 1904, 1905, and 1907 are still pending; not one of them has yet been decided or submitted to the court for final decision. In the 1903 suit,

and again in the suits of 1904 and 1905, the complainant in each bill of complaint expressed its willingness to supply the city and county of San Francisco and its inhabitants with water at the rates specified in the ordinance of 1902, and asked that it might, pending the litigation, be permitted to collect the rates fixed by that ordinance, upon such provisos as the court might think proper. In each case, however, the complainant stated that the rates of 1902 were less than the reasonable value of the services to be rendered. The rates adopted for 1908 are the rates of 1902, with this difference: the ordinance for 1908 fixes the compensation for water furnished the city and county for fire purposes and flushing sewers at $2.50 per month for each hydrant; this is an advance of 50 cents per month per hydrant, and, as there are more than 4,000 hydrants, the rates for 1908 (the rates attacked in this suit) are higher in the aggregate, other things being equal, by more than $2,000 per month, than the rates of 1902.

The Spring Valley Water Company now declares that the rates fixed by the ordinance of 1908 are still far too low to afford a just or reasonable recompense for its services and for the use of its property. For this reason complainant alleges the ordinance is repugnant to those provisions of the federal Constitution which prohibit the taking of property for public use without due process of law, and it now demands that each and all of the defendants, and all consumers of water in San Francisco, be enjoined, pending this litigation, from enforcing, or attempting to enforce, this ordinance by suit or otherwise, and from attempting in any manner to compel complainant to furnish water at the rates therein specified. As the propriety of restraining the defendants is the important question to be determined in this proceeding, it would be unprofitable to recite even the substance of the voluminous pleadings now on file. For the present purpose the following statement will be sufficient:

Complainant is a California corporation with a capitalization of $28,000,000, divided into 280,000 shares, having a par value of $100 per share. In September, 1903, it acquired its plant from the Spring Valley Waterworks, also a California corporation, which at the time of the transfer had a capitalization of but $14,000,000, divided into 140,000 shares, having a par value of $100 each. Complainant's capital stock is in the hands of about 1,800 stockholders. Immediately prior to the earthquake of April, 1906, the market price of said stock was from $37 to $38.50; since that time the price has fallen until it now varies from $18 to $24. This depreciation is alleged to be the result of hostile legislation by successive boards of supervisors. The aggregate indebtedness of the company is $17,859,000, on which the interest for the present fiscal year will be $760,000. The Spring Valley Company owns about 20,000 acres in its Peninsula system, 29,000 acres in the counties of Alameda and Santa Clara, and 2,730 acres in Lake Merced Ranch. The Peninsula system controls about 114 square miles of watershed, on which the company has four reservoirs with a joint capacity of 29,300,000,000 gallons; Crystal Springs, the largest of these, is about eight miles in length, has a water area of about 1,730 acres, and a capacity of 19,000,000,000 gallons. The Ala-

meda system controls at present about 600 square miles of watershed, stretching approximately from Mt. Hamilton on the south to Mt. Diablo on the north, and from Sunol on the west to Livermore Pass on the east. Alameda Creek and its tributaries bring practically all the drainage of this territory to Sunol. Here the subsurface flow is held by an underground dam built on the bed rock across the canyon; above this dam are 1,200 acres of gravel bed; 14,000 feet of cement tunnels collect the water after it has filtered through the gravel, and from this source 15,000,000 gallons of water are daily sent to San Francisco. Within the city limits the company has nine distributing reservoirs, with an aggregate capacity of 87,000,000 gallons; it has nine pumping stations, with a combined daily pumping capacity of 70,000,000 gallons; more than six miles of tunnel; 78 miles of water mains, from 22 to 54 inches in diameter; and 410 miles of distributing pipes laid in the streets of San Francisco; it is supplying nearly all the people of the city with water; its mains are connected with nearly all the buildings therein, whether public or private, and its customers number about 49,000; it supplies the city daily about 31,000,000 gallons of water, annually between eleven and twelve billion gallons, and has a present daily capacity of about 35,000,000 gallons; it has in storage in the neighborhood of 25,000,000,000 gallons of water, or two years' supply, with a daily inflow of 15,000,000 gallons from the Alameda system.

It is alleged that complainant's system of waterworks is not only ample for the needs of San Francisco with its present population, but with additional dams and aqueducts it will be capable of supplying sufficient water for more than 2,000,000 people, and that the value of the property is more than $50,000,000, and its actual cost to stockholders more than $53,758,450.72. Defendants deny any value to the Spring Valley Water Company property in excess of twenty or twenty-four million dollars, and any capacity, even with additional dams and aqueducts, to supply water to a population much greater than San Francisco has at the present time.

Complainant alleges it is entitled to have its rates so fixed for the fiscal year 1908–09 as to afford a sufficient annual revenue to pay its operating expenses, estimated at $600,000; its taxes, estimated at $375,000; an annual sum to make good the depreciation in its plant, estimated at $260,000; an annual sum to make good its losses by reason of the earthquake; and, in addition, an annual income of 7 per cent. per annum on its property in use for supplying the city and its inhabitants with water. The value of said property is claimed to be $45,000,000 for property in actual use, and $7,500,000 for property purchased for "reasonably immediate use." Defendants deny that complainant should receive, or is entitled to receive, any income in excess of that which will be yielded by the present ordinance; and deny that the company is entitled to anything for depreciation or earthquake damages.

The company contends that the ordinance in question will not yield an income of 2 per cent. net, above operating expenses and taxes, on the value of its property; that the supervisors have undervalued its

property, and the rate of income, 5 per cent., adopted by the board, even if it could be realized from the rates established in the ordinance, is wholly inadequate. This is denied by defendants, who assert that the rates fixed in the ordinance will yield an income of more than 5 per cent. per annum, net, on the fair value of the property actually in use; and that 5 per cent. net, after taxes and expenses are paid, is just. Complainant alleges that the ordinance of 1908 was passed for the purpose of depreciating the value of the property in order that defendants might purchase it for less than its actual value; that the rates provided in the ordinance are unreasonable, unfair, unjust, fraudulent, and confiscatory; that they were fixed arbitrarily and at random, and by mere guesswork, and were not based upon actual value of the properties, but upon the mere whim of the board of supervisors; that said board never did determine, or pretend to determine, the value of the property in actual use for supplying water to San Francisco; that the rates were fixed by the board without regard to complainant's rights, or to the supply of water; without considering the value of the service, or what would be a reasonable income based on the cost or the actual value of the works and properties used and owned by the company in furnishing water to San Francisco; without regard to complainant's bonded and floating indebtedness, or the annual interest thereon, or the actual operating expenses, or taxes, or the right of complainant's stockholders to a reasonable or any dividend on their stock; without any allowance for depreciation, or to provide for the replacement of portions of the plant destroyed by extraordinary casualties; and without taking into account the value of the franchise, or the value of the going and established business. The defendants deny all this, and aver that the rates were fixed upon the actual value of the property, and after a full, complete, careful, and laborious consideration of such property, and of each and every part thereof, and of each item alleged to have been disregarded.

Complainant contends that the board of supervisors, in estimating the value of the property, refused to consider or make any allowance for the following items, to wit: (1) Complainant's established business and its franchise, which have a distinct and intrinsic value of more than $4,000,000 in excess of the actual value of the tangible property; (2) the present serviceability of the Alameda system, such serviceability having been clearly demonstrated by continuous use since 1902; (3) the supervisors found a value of $880,492 for that portion of the plant destroyed by earthquake; this sum was deducted from the estimated gross value of the property, but no allowance was made for certain subsequent restorations and replacements, amounting to $571,715.13; (4) the value of water rights and other properties not in use at the present time for supplying water, but acquired by the company for "reasonably immediate use"; that such water rights and properties cost "many hundreds of thousands of dollars," and are now "worth many millions."

It is also urged in behalf of complainant that the board of supervisors, in practically re-enacting the rates of 1902, has ignored the

changes which have taken place during the past six years, and has given no consideration to increased taxes, operating expenses, and capital expenditures since 1902, or to depreciation. The figures furnished by the company show that operating expenses in 1902 were $454,013.77, in 1907 $607,232.07; taxes in 1902 were $236,828.97, in 1907 $314,933.07. The gross revenues of 1902 were $1,980,651.72, as against $1,907,272.20 in 1907. Thus the taxes and expenses of 1907 exceeded those of 1902 by $231,322.40, and the gross income of 1907 was less than that of 1902 by $73,379.52. It thus appears that the net income of 1902 was larger than the net income of 1907 by $304,701.92. These figures given by Capt. Payson, president of the Spring Valley Water Company, do not agree with those of Mr. Schussler, its chief engineer. According to the tabular statement of income and expense given by the latter, the net income of the company in 1902 exceeded that of 1907 by but $276,070.84, instead of $304,701.92. The estimated taxes and expenses of 1908 will exceed those of 1902 by more than $284,000, and the net income, less taxes and operating expenses, of 1902 will exceed the net income of 1908, as estimated by complainant, by $18,808.98. Since 1902 the company has sold more than $3,000,000 worth of its bonds, and invested the proceeds in additional constructions. The dividend paid to the stockholders in 1902 was 4.2 per cent. on the par value of the capital stock. For more than two years the stockholders have had no dividends; during this time they have paid assessments amounting to $840,000, and for the past 7½ years the stockholders have received as net dividends an average of 1.95 per cent. per annum. During the whole of this time the company has been collecting the rates of 1902. It is alleged that the structural portion of the plant, such as flumes, gates, buildings, pipes, reservoirs, etc., which decay and depreciate, are worth $13,-000,000, and the annual allowance therefor should be more than $260,000. Defendants deny that the franchise and element of going business have any value whatever, or, if they have value, that it should be added to the value of the tangible property for rate-fixing purposes; deny that the permanent serviceability of the Alameda system has yet been demonstrated, because no consecutive years of marked deficiency in rainfall have occurred since 1902, showing how much a drought would lower the subsurface water in the Pleasanton artesian wells and the Sunol filter beds; deny that the replacements were necessary, or that they are being used for the benefit of the city, or that they cost $571,715.13, or any such sum. Defendants claim that complainant should be allowed only for property actually and physically in use, and not for property acquired and being prepared for "reasonably immediate use." Defendants also deny that depreciation is a cost or expense incurred by complainant in supplying water to San Francisco for the fiscal year 1908–09.

In order to provide what complainant insists is a just and reasonable compensation for the use of its property, it will therefore be necessary to make rates which will yield a gross annual income of not less than $4,910,000 as against $2,395,045, estimated gross income upon

165 F.—43

which the supervisors based the rates of the ordinance in question. These estimates more in detail are as follows:

Rates fixed by the supervisors in the ordinance of 1908, designed to provide for income and expenses:

| | |
|---|---|
| 5% net income on $25,000,000, estimated value of the company's property | $1,250,000 |
| Operating expenses | 600,000 |
| Taxes | 375,000 |
| **Total** | **$2,225,000** |

Estimated income of the company for all service for the year beginning July 1, 1908, and ending June 30, 1909:

| | |
|---|---|
| Income from private consumers (estimated by the company) | $1,710,032 |
| 15% increase of business (estimated by the board) | 256,505 |
| Income from shipping (estimated by the company) | 122,002 |
| Income from contracts (estimated by the company) | 70,025 |
| Miscellaneous (estimated by the company) | 60,481 |
| Hydrants (estimated by the board) | 120,000 |
| Public buildings (estimated by the board) | 20,000 |
| Public schools (estimated by the board) | 15,000 |
| Parks (estimated by the board) | 15,000 |
| Sprinkling streets (estimated by the board) | 6,000 |
| **Total income** | **$2,395,045** |

The Spring Valley Water Company claims that rates should be so fixed as to provide for income, expenses, etc., as follows:

| | |
|---|---|
| 7% on $45,000,000, the value of company property in actual use | $3,150,000 |
| 7% on $7,500,000, the value of company property purchased for reasonably immediate use | 525,000 |
| Earthquake damages | |
| Depreciation | 260,000 |
| Operating expenses | 600,000 |
| Taxes | 375,000 |
| **Total** | **$4,910,000** |

Complainant finally alleges that it will suffer irreparable damage unless it is permitted to collect such rates as will produce a fair, just, and reasonable income; that defendants threaten to enforce said ordinance and prevent complainant from collecting any other rates than those specified therein; that the rates payable by said city and county of San Francisco for water are payable out of the general fund, and, if that fund be exhausted before the company has received just compensation for the present year, complainant will be remediless, because under the law the debts of one fiscal year cannot be paid out of the revenues of any subsequent year, and that $300,000 is less than a reasonable sum for such water for the present year.

Complainant prays the court to decree:

(1) That the ordinance is null and void.

(2) That complainant is entitled to have rates fixed for the present year so they will in the aggregate afford a just compensation for the services rendered, based on the value of the property used therefor, and of property purchased therefor to be used in the "reasonably imme-

diate future," that will yield a sufficient annual income to complainant to pay its operating expenses, taxes, an annual sum for deprecia·tion of plant, provide for the replacement of portions of the plant destroyed by extraordinary casualty, and realize in addition the rate of 7 per cent. per annum upon its property in actual use in so supplying said city and county and its inhabitants with water, and that such value of said property is at least $45,000,000 for property in actual use, and $7,500,000 for property purchased for "reasonably immediate use."

(3) That the board of supervisors be required to fix water rates for said fiscal year which will provide an income sufficient for the purposes mentioned in paragraph 2; and that the board also be required to afford complainant notice and opportunity to be heard, and to allow complainant and others to introduce evidence, "or to decree that said board has no jurisdiction in the premises to fix rates."

(4) "That each and all of said defendants, and all consumers of water in said city and county, be, pending this litigation and perpetually at the conclusion of the litigation, enjoined from enforcing or attempting to enforce said pretended bill or ordinance pretended to have been finally passed June 15, 1908, and from bringing or causing to be brought any suit or action against the complainant, in law or in equity, to enforce said pretended bill or ordinance, or any forfeiture of the complainant's franchise, works. or property, or for any other purpose, on account of complainant's failure or refusal to conform to the rates thereby intended to be prescribed, and from any attempt, directly or indirectly, to compel complainant to furnish water at said rates; and that upon the filing of this bill of complaint the court or your honors, by order duly given and made, upon such provisos as may seem equitable, direct the defendants to show cause on a day certain why such injunction should not be issued pending this litigation, and that in the meantime, upon and from the filing of this bill of complaint until the determination of the court or your honors under such order to show cause, a like temporary injunction and restraining order be granted by the court or your honors."

(5) That the court by decree determine what property is in actual use for supplying water; the value of such property; the value of the franchise and going business; the reasonable net income on such value; the amounts to be allowed for taxes, operating expenses, annual depreciation of plant, and for that portion of the plant destroyed by earthquake; also what is the reasonable value of the services rendered by complainant, and the value of property bought for future use, and what income should be derived therefrom.

(6) That defendants be estopped from placing any less value than $25,000,000 on complainant's properties as of date June 20, 1889.

(7) That defendants be restrained pending the suit from reducing the general fund of said city and county below a sum which will be sufficient to pay complainant reasonable rates for water furnished said city and county during the year 1908-09.

(8) Or that it be decreed that the business of complainant is being run without profit, at an enormous loss, and that complainant may sell

any or all of its property, and that it may sell water to consumers other than the city and county of San Francisco and its inhabitants.

The jurisdiction of this court is invoked on the ground that the ordinance in question is repugnant to that portion of the fourteenth amendment to the Constitution of the United States in which it is ordained that no state shall "deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." This prohibition rests upon the board of supervisors, and upon every other instrumentality, executive, legislative or judicial, by which or through which the power of the state is exercised. Chicago, etc., R. R. Co. v. Chicago, 166 U. S. 226, 17 Sup. Ct. 581, 41 L. Ed. 979; Capital City Gas Co. v. Des Moines (C. C.) 72 Fed. 818, 824; Central, etc., Ry. Co. v. R. R. Com. (C. C.) 161 Fed. 925, 965; Cooley, Const. Lim. 198.

The terms "life, liberty and property" embrace every right which the law protects; they include not only the right to own and hold, but also the right to use and enjoy property. Profits and income are property. The right of contract, the right to fix the terms and conditions upon which the owner will sell, lease, or otherwise dispose of his property, is itself property, and any statute or ordinance which limits or curtails these rights deprives the party affected of his property. But when a man parts with his property, it is no longer his. When he devotes it to the public use, it ceases to be private property. "He, in effect, grants to the public an interest in such use, and must, to the extent of that interest, submit to be controlled by the public for the common good, as long as he maintains the use. When private property is devoted to public use, it is subject to public regulation. If the right to regulate exists," the right to establish the reasonable compensation for services as one of the means of regulation is implied. Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77.

This is the principle which justifies and sustains that section of the Constitution of California in which it is made the duty of the board of supervisors to regulate water rates. In reply to the claim that the power to fix water rates is virtually left in the hands of the water consumers because the consumers elect the supervisors, and this is a violation of the principle that no man shall be a judge in his own cause, the Supreme Court in Spring Valley Waterworks v. Schottler, 110 U. S. 347, 354, 4 Sup. Ct. 48, 51, 28 L. Ed. 173, held that the municipal authorities had the power to regulate the prices at which the water company shall supply its consumers; that the supervisors are "bound in morals and in law" to fix reasonable rates, and that such regulations do not deprive the company of its property without due process of law.

"What they did was from the beginning subject to the power of the body politic to require them to conform to such regulations as might be established by the proper authorities for the common good. They entered upon their business and provided themselves with the means to carry it on subject to this condition. If they did not wish to submit themselves to such interference, they should not have clothed the public with an interest in their concerns." Munn v. Illinois, 94 U. S. 113, 133, 24 L. Ed. 77.

In Peik v. Chicago, etc., R. R. Co., 94 U. S. 164, 24 L. Ed. 97, decided in 1876, it was held that, while the owner is entitled to reasonable compensation for property in public use, the question as to what is reasonable is a question for the legislative body, and its decision binds the courts as well as the people. This doctrine was for a time unhesitatingly followed and affirmed by state and subordinate federal courts. It was frequently decided that a person or corporation injured by legislative determination as to what is a reasonable rate for the use of property affected with a public interest could not successfully claim that it had been deprived of its property without due process of law. Tilley v. Savannah, etc., R. R. Co. (C. C.) 5 Fed. 641; Spring Valley Waterworks v. Bartlett (C. C.) 16 Fed. 615; Atlantic, etc., R. R. Co. v. United States (D. C.) 76 Fed. 186, 196; Hockett v. State, 105 Ind. 250, 5 N. E. 178, 55 Am. Rep. 201; State v. Chicago, etc., Ry. Co., 38 Minn. 281, 297–298; 37 N. W. 782; Wellman v. Ry. Co., 83 Mich. 592, 47 N. W. 489.

In subsequent decisions the rule was announced that judicial interference is only permissible "where the schedule of rates established will fail to secure to the owners of the property some compensation or income from their investment. * * * Where the proposed rates will give some compensation, however small, to the owners, * * * the courts have no power to interfere. * * * But where the rates prescribed will not pay some compensation to the owners, then it is the duty of the courts to interfere, and protect the companies from such rates." Chicago, etc., R. R. Co. v. Dey (C. C.) 35 Fed. 866, 878, 1 L. R. A. 744.

These authorities lend support to the position taken by defendants that, inasmuch as the question of rates has been left to the board of supervisors, its decision, like the decision of any other judicial tribunal, however inferior, upon a question of fact, is conclusive; and unless there has been fraud in fixing the rates, or the rates are so palpably and grossly unreasonable as to be fraudulent in effect, the court is powerless to set them aside. The only logical deduction from this doctrine was that legislative bodies might, under the guise of regulation, reduce the net earnings of public service companies to the minimum, and thus, while not taking their physical property, deprive them for the most part of that which constitutes its value; that is, of its use, its profits, and its earnings. This doctrine later gave way to the principle that, while the Legislature has the power to prescribe the charge, the reasonableness or unreasonableness of such a charge is a question for the courts; and if, in the exercise of their legal discretion, the courts determine that a charge so fixed is unreasonable, that determination must prevail over any presumption in favor of the legislative act.

In Chicago, etc., R. R. Co. v. Minnesota, 134 U. S. 418, 456, 10 Sup. Ct. 462, 466, 33 L. Ed. 970, this question was presented to the Supreme Court of the United States on a writ of error to review a judgment of the Supreme Court of Minnesota. The Minnesota court had refused to receive testimony offered by the railroad company as to

whether a certain rate fixed by the Railroad and Warehouse Commission of that state was reasonable. The refusal was based on the ground that the statute of Minnesota expressly declares that rates fixed by the commission, "if it proceeds in the manner pointed out by the act, are not simply advisory, nor merely prima facie equal and reasonable, but final and conclusive as to what are equal and reasonable charges." Notwithstanding the fact that previous to fixing the rate the commission had investigated the matter, and had listened to a representative of the railway company, the Supreme Court of the United States held that the statute was in conflict with the Constitution of the United States, because it deprived the company of its right to a judicial investigation by due process of law under the terms and with the machinery provided for the investigation judicially of the truth of a matter in controversy. The court uses the following language:

"The question of the reasonableness of a rate of charge for transportation by a railroad company, involving as it does the element of reasonableness both as regards the company and as regards the public, is eminently a question for judicial investigation, requiring due process of law for its determination. If the company is deprived of the power of charging reasonable rates for the use of its property, and such deprivation takes place in the absence of an investigation by judicial machinery, it is deprived of the lawful use of its property, and thus, in substance and effect, of the property itself, without due process of law and in violation of the Constitution of the United States; and in so far as it is thus deprived, while other persons are permitted to receive reasonable profits upon their invested capital, the company is deprived of the equal protection of the laws."

These views have been approved and sustained by the later decisions. Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 397, 399, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Smyth v. Ames, 169 U. S. 466, 526, 18 Sup. Ct. 418, 42 L. Ed. 819; Louisville & Nashville R. R. Co. v. Kentucky, 183 U. S. 503, 510, 22 Sup. Ct. 95, 46 L. Ed. 298; Minneapolis, etc., R. R. Co. v. Minnesota, 186 U. S. 257, 22 Sup. Ct. 900, 46 L. Ed. 1151; Stafford v. Chippewa, etc., R. R. Co., 110 Wis. 331, 351, 85 N. W. 1036; Capital City Gas Co. v. Des Moines (C. C.) 72 Fed. 818, 822; Matthews v. Bd. of Corp. Com'rs (C. C.) 97 Fed. 404; Tift v. Southern Ry. Co. (C. C.) 138 Fed. 753, 760; Cons. Gas Co. v. New York (C. C.) 157 Fed. 849, 882; Western Union Tel. Co. v. Myatt (C. C.) 98 Fed. 335, 342, 354.

In the last case the court says:

"Courts cannot legislate and pass judgment thereon. Legislative bodies, or boards that are constituted as legislative agencies, cannot render judgment upon their legislative acts. In either case neither the proceeding nor the result would be due process of law."

Under the law the company is entitled to a just and reasonable compensation for the use of that portion of its property which is employed in collecting water and bringing it to the people of San Francisco. This just and reasonable compensation is property, and up to and including the full measure of that which is just and reasonable it is the property of the complainant; it cannot be taken, directly or indirectly, by the power of the state for public use without due process of law. To say that a body of rates which affords some compensation, but something less than a reasonable compensation, is not confiscatory, is sim-

ply to say that the Constitution protects a portion, but not all, of a man's property. If the supervisors have the power, and it is their duty to prescribe just and reasonable rates, and the court has the power to decide whether such rates are reasonable, and to annul ordinances in which the rates prescribed are unjust and unreasonable, it must follow that "the court has no power," as Judge Morrow says in Spring Valley Waterworks v. San Francisco, infra, "to diminish the measure of what is just compensation in any degree." The court must ascertain the fact; ascertain whether the ordinance crosses the line which separates that which is just and reasonable from that which is unjust and unreasonable, and so declare. Southern Pac. Co. v. Bd. R. R. Com'rs (C. C.) 78 Fed. 236; Reagan v. Farmers' L. & T. Co., 154 U. S. 362, 399, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Cotting v. Kansas City Stockyards Co., 183 U. S. 79, 87, 22 Sup. Ct. 30, 46 L. Ed. 92; Cons. Gas Co. v. New York (C. C.) 157 Fed. 849, 882; Cons. Gas Co. v. Mayer (C. C.) 146 Fed. 150, 152; Spring Valley Waterworks v. San Francisco (C. C.) 124 Fed. 574, 601.

In the last case cited Judge Morrow decided that 5 per cent. per annum was the smallest income which the court could, under the evidence in that proceeding, consider as reasonable and just, and that an income of 4.4 per cent. on the value of the property, or 3.3 per cent. on the capital stock of the company, "was unreasonably low and confiscatory, and amounted to the taking of private property for public use without just compensation, thereby depriving complainant of its property without due process of law."

In the subsequent case of Spring Valley Water Co. v. City and County of San Francisco (No. 13,598, in this court) 165 Fed. 657, on the hearing of the motion for a preliminary injunction, Judge Gilbert adjudged that an annual income of something less than 4.4 per cent. on the value of the property was less than a just compensation, and was such a taking of the property of complainant for public use in violation of constitutional provisions as would justify the injunction.

It must always be borne in mind that the company has devoted certain property to public use; the public has thus acquired an interest in the property; the company owes a duty to the public as well as to its stockholders; and, when it is declared that rates must be just and reasonable, it must be understood that they are to be just and reasonable both to the company and to the public. Generally, that which is just, but no more than just, to the owner, ought to be the equivalent of that which is just, but no more than just, to the consumer. "A corporation is not entitled as of right, and without reference to the interests of the public, to realize a given per cent. upon its capital stock. Stockholders are not the only persons whose rights or interests are to be considered. The rights of the public are not to be ignored. The public cannot properly be subjected to unreasonable rates in order simply that stockholders may earn dividends." Covington & Lexington T. R. Co. v. Sandford, 164 U. S. 578, 597, 598, 17 Sup. Ct. 198, 205, 41 L. Ed. 560; Seaboard Air Line Ry. Co. v. R. R. Com. (C. C.) 155 Fed. 792, 805; Tift v. Southern Ry. Co. (C. C.) 138 Fed 753, 764.

Mr. Justice Savage in Water District v. Water Co., 99 Me. 371, 59 Atl. 537, 540, goes so far in stating the rule as to say:

"Rates must be reasonable to both (the company and the customer), and, if they cannot be to both, they must be to the customer."

In determining what is just and reasonable compensation to the owner for the use of property employed in the public service, the rule stated as follows, in San Diego Land Co. v. National City, 174 U. S. 739, 757, 19 Sup. Ct. 804, 43 L. Ed. 1154, has been uniformly approved:

"The contention of the appellant in the present case is that in ascertaining what are just rates the court should take into consideration the cost of its plant, the cost per annum of operating the plant, including interest paid on money borrowed and reasonably necessary to be used in constructing the same, the annual depreciation of the plant from natural causes resulting from its use, and a fair profit to the company over and above such charges for its services in supplying the water to consumers, either by way of interest on the money it has expended for the public use, or upon some other fair and equitable basis. Undoubtedly all these matters ought to be taken into consideration, and such weight be given them, when rates are being fixed, as under all the circumstances will be just to the company and to the public. The basis of calculation suggested by the appellant is, however, defective in not requiring the real value of the property and the fair value in themselves of the services rendered to be taken into consideration. What the company is entitled to demand, in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public."

Under the former rule that a rate-fixing ordinance, in the absence of fraud, was conclusively presumed to be just and reasonable, it was possible, under the guise of regulation, to reduce the earnings of property devoted to public service to the vanishing point, and thus set at naught the constitutional guaranty against taking property for public use without just compensation. The present rule gives to every person owning such property who is aggrieved by such an ordinance his day in court; neither his plant, nor any portion of its just and reasonable earnings, can be taken without due process of law. He is entitled to a fair return, not always upon the cost of the property, because it may have cost too much; not always upon the outstanding indebtedness, because it may be in excess of the real value of the property; not always upon the total amount invested, because some portion of that which is acquired by the investment may be neither necessary nor presently useful for the public service; but upon the fair present value of that which is used for the public benefit, having due regard always to the reasonable value of the service rendered.

Each case must depend very largely upon its own special facts, and every element and every circumstance which increases or depreciates the value of the property, or of the service rendered, should be given due consideration, and allowed that weight to which it is entitled. It is, after all, very much a question of sound and well-instructed judgment. Smyth v. Ames, 169 U. S. 466, 546, 547, 18 Sup. Ct. 418, 42 L. Ed. 819; San Diego L. & T. Co. v. Jasper, 189 U. S. 439, 442, 23 Sup. Ct. 571, 47 L. Ed. 892; San Diego L. & T. Co. v. Jasper (C. C.) 89 Fed. 274, 282; San Diego L. & T. Co. v. Jasper (C. C.) 110 Fed. 702, 714; Chicago, etc., Ry. Co. v. Tompkins (C. C.) 90 Fed. 363, 369; Seaboard Air Line Ry. Co. v. R. R. Com. (C. C.) 155 Fed. 792, 806.

It is charged that the ordinance in question was passed for the purpose of depreciating the value of complainant's property in order that defendants might purchase it for less than actual value. It is also stated that the rates set out in the ordinance were fixed "arbitrarily, at random, by guesswork, and upon mere whim of the board of supervisors." These charges have not been proven. On the contrary, the evidence shows that months were devoted to careful and conscientious investigation. The Spring Valley Water Company had every opportunity to be heard, and to present to the board any evidence or argument which it deemed proper. The president and attorney of the company addressed the board frequently; representative citizens were permitted to express their views. Frequent discussions were had by the board, and its members personally inspected the company's property In short, there is nothing in the record which indicates that the supervisors, or either or any of them, were actuated by any other motive than to do the thing which was just and right. For the present proceeding, this is a final disposition of the allegations that the ordinance of 1908 was passed for the purpose of depreciating the value of complainant's property, and that the rates fixed in the ordinance are fraudulent.

Concerning the allegation that the board of supervisors "refused to allow anything for the four important elements of value which they excluded, namely, franchise, going business, repairs of earthquake damage, and value attaching to Alameda system due to demonstration of permanency," and in so doing that "they acted 'arbitrarily' and 'without the exercise of judgment and discretion,' and therefore 'they violated their duty and went beyond the powers conferred upon them,'" complainant takes the position that on application for preliminary injunction the court may review the proceedings before the rate-fixing body, and, if it clearly appears that elements which should have been considered have been ignored, a presumption arises that the rates are confiscatory; that this presumption is so strong, any presumption in favor of the validity of the ordinance is overthrown, and so conclusive that the court will not permit the supervisors to show that the deficiency from rejected elements was made good by generous allowance on other elements; therefore, the complainant is entitled to have the rates enjoined until the matter can be fully investigated, and such an investigation cannot be had before the final hearing.

I cannot agree with counsel that such serious consequences flow from what is alleged to be arbitrary conduct on the part of the board. This case comes here on one vital issue: Are the water rates confiscatory? To this all other questions involved are mere incidents. If the water rates in question are confiscatory, then the ordinance is repugnant to the federal Constitution, and must be pronounced invalid. Its invalidity cannot be healed by showing the supervisors were actuated by the purest motives, that they committed no error in applying the law to the facts, and that their deliberations were conducted in strict obedience to the rules which govern courts in the administration of justice, and in the admission and rejection of evidence. But, on the other hand, if it appears that the rates will afford com-

plainant a just and reasonable compensation for the use of its property, the ordinance is not repugnant to the constitutional provision invoked, because it does not deprive the company of anything whatever. And this is so even though it be shown that the board in its proceedings violated every rule in the law of evidence. The rates are either just and reasonable or unjust and unreasonable, and that fact must be ascertained by this court from its own independent investigations, and not from a review of the proceedings before the board of supervisors to ascertain whether it erred in the admission or rejection of testimony, or whether, on the testimony before that body, it should have arrived at a different conclusion.

This court cannot control the discretion of the supervisors; it cannot substitute its judgment for theirs. The power and duty of fixing water rates is cast by the Constitution on that board, and not on this court. The law nowhere provides an appeal to this court from an ordinance adopted by the board of supervisors, nor does it clothe this tribunal with any authority to review, revise, correct, or send back to that body for reconsideration an ordinance establishing the compensation to be collected for water. It has not been made entirely clear that the board of supervisors owed any other duty to complainant than to fix by ordinance a schedule of rates which, as a whole, will yield a just and reasonable compensation on the fair present value of the property used for San Francisco and its people. It may be that the rates were so adjusted that certain consumers will receive water at prices for less than it is worth; it may be that in determining the value of complainant's property some elements were placed too high, others too low, and still others totally ignored; but if, on the whole, the result is reasonable, and complainant receives a just income, it certainly has no grievance and no cause of action. This court will only consider whether the rates as a whole, and the value of the property taken as a whole, are fair and reasonable. Covington, etc., R. Co. v. Sandford, 164 U. S. 578, 596, 17 Sup. Ct. 198, 41 L. Ed. 560; Smyth v. Ames, 171 U. S. 361, 364, 18 Sup. Ct. 888, 43 L. Ed. 197; San Diego L. Co. v. National City, 174 U. S. 739, 760, 19 Sup. Ct. 804, 43 L. Ed. 1154; Minneapolis, etc., Ry. Co. v. Minnesota, 186 U. S. 257, 22 Sup. Ct. 900, 46 L. Ed. 1151; Chicago & N. W. Ry. Co. v. Dey (C. C.) 35 Fed. 866, 878, 1 L. R. A. 744; Matthews v. Bd. Corp. Com'rs (C. C.) 106 Fed. 7; San Diego L. & T. Co. v. Jasper (C. C.) 110 Fed. 702; Steenerson v. Great N. Ry. Co., 69 Minn. 353, 377, 72 N. W. 713.

Referring to the power of boards of supervisors in California to fix water rates, Mr. Justice Harlan in San Diego L. & T. Co. v. National City, 174 U. S. 739, 753, 19 Sup. Ct. 804, 810, 43 L. Ed. 1154, says:

"It is equally clear that this power could not be exercised arbitrarily and without reference to what was just and reasonable as between the public and those who appropriated water and supplied it for general use; for the state cannot by any of its agencies, legislative, executive, or judicial, withhold from the owners of private property just compensation for its use. That would be a deprivation of property without due process of law. Chicago, Burlington, etc., Railroad v. Chicago, 166 U. S. 226, 17 Sup. Ct. 581, 41 L. Ed. 979; Smyth v. Ames, 169 U. S. 466, 524, 18 Sup. Ct. 418, 42 L. Ed. 819.

But it should also be remembered that the judiciary ought not to interfere with the collection of rates established under legislative sanction unless they are so plainly and palpably unreasonable as to make their enforcement equivalent to the taking of property for public use without such compensation as under all the circumstances is just both to the owner and to the public; that is, judicial interference should never occur unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for the public use. Chicago & Grand Trunk Railway v. Wellman, 143 U. S. 339, 344, 12 Sup. Ct. 400, 36 L. Ed. 176; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 399, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Smyth v. Ames, above cited. See, also, Henderson Bridge Co. v. Henderson City, 173 U. S. 592, 614, 615, 19 Sup. Ct. 553, 43 L. Ed. 823."

This is quoted with approval in Spring Valley Water Co. v. San Francisco (No. 13,598) 165 Fed. 657, on application for preliminary injunction, decided by Judge Gilbert, who says:

"Judicial interference is permissible only in a case where it is clearly shown that the legislative regulation of rates is such as to deny the owner just compensation for his property or services taken for public use."

In Spring Valley Waterworks v. San Francisco (C. C.) 124 Fed. 574, 584, on an application for preliminary injunction, Judge Morrow uses this language:

"It is not the province of the court to review the evidence upon which the board of supervisors acted in adopting the ordinance under consideration. Whether the ordinance deprives the complainant of its property without due process of law, denies to it the equal protection of the laws, or abridges the privileges and immunities of the complainant, are questions to be determined by the court in this action upon an original independent investigation, and not by an examination of the proceedings of the board to ascertain what evidence it received and acted upon, and whether that evidence was sufficient to justify the conclusion reached. This does not mean that the same evidence submitted to the board may not be submitted to the court, as appears to have been done in this case; and, if the evidence is competent and relevant to the issues before the court, it will be considered. But it does not follow that, because the board may have received evidence that the court would have rejected, or has rejected evidence the court would have received, the proceedings of the board are to be regarded as illegal, and the ordinance an act depriving complainant of constitutional rights. So with respect to the proceedings of the board in determining the value of complainant's property in actual use, and the necessary expense that will be incurred in keeping it in operation, elements may have been considered by the board that should have been omitted, and elements omitted that should have been considered, and still the ordinance be, in effect, just and constitutional."

Mr. Justice Van Fleet in San Diego Water Co. v. San Diego, 118 Cal. 556, 50 Pac. 635, 38 L. R. A. 460, 62 Am. St. Rep. 261, in speaking of the scope of judicial inquiry in cases of this kind, says:

"All they (the courts) have to consider is whether in a given case the result of the council's action will be to take the property of the complaining party without compensation."

It would seem, therefore, that the court is limited to the determination of a single question, namely, is the ordinance confiscatory? On motion for preliminary injunction it is not necessary to show clearly and beyond doubt that the rates are confiscatory; it is sufficient if it appears from the evidence that the court will probably on final hearing pronounce the ordinance invalid, because its effect will be to deprive

complainant of its property without compensation. Such an application, however, does not enlarge the powers of this court, nor confer appellate jurisdiction which does not exist at the final hearing. It does not confer any jurisdiction by which this court may review the proceedings of the board of supervisors, and temporarily set aside an ordinance because elements may have been considered by the board that should have been omitted, and elements omitted that should have been considered. The court cannot act arbitrarily, or without exercise of judgment or discretion, or without investigation, even on motion for preliminary injunction. The magnitude of the interests involved, the fact that an order is asked the effect of which will be to restrain the enforcement of a municipal ordinance adopted only after months of investigation, and probably to confer upon complainant the power to regulate rates for the present fiscal year, demand that this court should investigate and carefully weigh the facts which tend to show whether the rates are actually confiscatory. The argument "that this hearing is not for the purpose of determining whether the ordinance deprives the company of its property," but merely to establish a probability and presumption of the right to an injunction pendente lite, is not altogether correct. While it is not proper for the court at this time to decide the merits of the case, nevertheless the court must decide every question which is essential to a wise and just exercise of judicial discretion in granting or withholding the injunction. The court should ascertain, not from conjecture nor by inference from mistakes committed by the rate-fixing body, but from an investigation of the facts, whether there are real and substantial grounds for believing the ordinance is probably confiscatory. If, on the final hearing, the court cannot interfere with rates unless they are clearly confiscatory, it is unreasonable to think that on an application for a preliminary injunction, when it is shown that the rate-fixing agency erred in rejecting elements of value which it should have considered, the court may draw an inference from this that the ordinance is probably invalid, and thereupon annul its enforcement, suspend the operation of the rates, and grant to the complainant for the time being practically all the relief which it could obtain as a result of a final decree.

## Rate of Income.

We now come to the pivotal issues of this controversy. First, what is the probable reasonable rate of income for the property used in supplying San Francisco with water? Second, what is the probable reasonable value of such property?

It is insisted that rates of interest have recently increased by 1 to 2 per cent., and consequently a 5 per cent. net income on its property in use is no longer just to the company. This reason is not conclusive. The conditions which have caused interest rates to rise are probably temporary. In times of financial distress, when money is very much needed and not easily obtained, rates of interest go up, and many of those who most need money are forced to throw on the market property which otherwise they would hold. When unusual quantities of property are for sale by owners who must have cash, prices fall.

Thus it often occurs that high rates of interest are followed and counterbalanced by lower prices. Higher rates of interest do not necessarily indicate that complainant's services have become more valuable, nor do they justify a higher rate of income without a corresponding adjustment in the value of the property on which the income is computed. Steenerson v. Great Northern Ry. Co., 69 Minn. 353, 387, 72 N. W. 713. An income of 5 per cent. net, after all taxes, operating expenses, and other legitimate and proper charges are deducted from the gross income, is neither unreasonable nor confiscatory.

## Expert Testimony as to Value.

For rate-fixing purposes the board of supervisors has valued the Spring Valley Water Company's property as follows: In 1902, $21,468,210; 1903, $24,124,309; 1904, $24,612.212; 1905, $25,001,441; 1906, $25,450,320; 1907, $24,569,828; 1908, $24,925,321. On the present hearing the experts for the company valued the property as follows: Frederick P. Stearns, $70,000,000; James D. Schuyler, $45,960,000; Ralph Herring, $44,770,900; Arthur L. Adams, from $40,000,000 to $45,000,000; H. Schussler, $56,568,000. The experts for the defendants have valued the property as follows: Edwin Duryea, $25,451,000; Desmond Fitzgerald, $22,336,643.55; C. E. Grunsky, $28,021,389; Marsden Manson, $24,925,321; J. H. Dockweiler, $24,059,856.15. The estimates of Adams, Schussler, Manson, and Dockweiler were made for the present year; the other estimates were made in 1903 and 1904. The wide range covered by these figures is remarkable. Each witness is an expert in such matters, and has had long and varied experience in the conduct and study of great engineering enterprises. Practical scientific methods of valuation ought to yield approximately the same results. The highest valuation here is three times the lowest. Between the highest and the lowest valuations made by complainant's witnesses there is a difference of $24,000,000; and Mr. Schussler, chief engineer of the Spring Valley Waterworks for more than 10 years, reaches a figure which differs from that of each other expert by more than $11,000,000. The estimates given on behalf of defendants do not take so wide a range; between the highest and lowest the difference is $5,287,745, notwithstanding the fact that $3,900,000 of Mr. Grunsky's estimate is for intangible property, viz., for franchise and going business, and that Mr. Fitzgerald based his estimate on the reasonable actual cost of the plant, and not on its present value. The variation in these estimates is due in some measure to the fact that four of the experts, namely, Fitzgerald, Manson, Dockweiler, and Duryea, fail to assign anything for the so-called intangible value of the property, and, of the others who do allow such values, only Adams and Herring agree as to the theory and method of estimating them.

Mr. Grunsky allows $1,400,000 for the established business. This value he says results in part from the numerous connections between the company's distributing system and the service pipes of customers; he determines the amount of this allowance by taking 25 per cent. of the valuation of the city distributing system. This sum does not in-

clude the cost of· connections, but is allowed in part because of the fact that such connections exist. Mr. Grunsky also allows $2,500,000 for franchise. This amount he ascertains by taking 10 per cent. of a "reasonable estimate of the cost of reconstructing and reacquiring the properties, including the value of the established business." He says the franchise is not defined by any specific agreement with the city, and therefore there is no "definite basis for its determination," but he recommends it because of the uncertainty of adequate returns on investments in water properties, and the special risks and responsibilities assumed by the Spring Valley people in establishing and maintaining their works.

Mr. Stearns thought a proper estimate of the value of a going concern "should include the cost of organizing the business and establishing it on such a basis that it now has an annual revenue from nearly all of the buildings in the city, and due allowance should be made for the risk taken in starting a new business which may or may not be successful," and that there should be "an addition to the value otherwise obtained, for the skill and enterprise which has produced the works of special value." In other words, in determining the value of the plant, he would add to the physical value further sums for the business value of the going concern, and also for skill and enterprise.

Mr. Grunsky estimated the cost of bringing a supply of water to San Francisco from the Tuolumne river at $39,531,000. Mr. Stearns revises this estimate, and finds the first cost of the Tuolumne scheme will be $54,400,000; to this he adds $16,100,000, which represents his estimate of the difference between the cost of future additions to the Tuolumne system and those which will be necessary for the Spring Valley plant. The final result of his computation is that the Spring Valley plant, measured by the cost of·the Tuolumne scheme, has a value of $70,000,000.

Mr. Herring says the value of the property is made up of tangible value and intangible value. The tangible value includes the city distributing system, pumping stations, reservoirs, pipes, conduits, lands, water rights, etc. The intangible value is a sum "representing what may be called the business value, going concern or good will." "The tangible value," he says, "I found to be $39,770,900. The intangible value I have estimated at $5,000,000. It is usual in waterworks practice to value works on the basis of alternate propositions for a water supply." Mr. Herring arrives at the intangible value, $5,000,000, by taking one-third of the difference between his estimated value of the tangible property, $39,770,900, and his estimate of the cost of the Tuolumne system, $55,000,000.

Mr. Adams considers: First, that in order to pay stockholders current rates of interest on their investment, from its inception the property should have a value of $50,500,000; second, that the actual investment, exclusive of loss to stockholders from lack of revenue subsequent to 1880, but inclusive of such loss prior to said date, or the cost of establishing the business, $5,671,000, would be from thirty-five to thirty-six million dollars; third, that the cost of a complete substitutional system would be fully $50,000,000; fourth, that the value of the service limits the value to be placed on the property to forty or

forty-five million dollars; fifth, that a valuation of $35,000,000 is too low to allow a proper income to stockholders; he therefore concludes that the works are worth from forty to forty-five million dollars for rate-fixing purposes. In coming to this conclusion his judgment was chiefly influenced by the idea that rates to consumers "should not be increased beyond a certain point in pursuit of a sound public policy in the interest of both the water company as well as the rate-payers." He includes in this estimate the value of the going business at $5,671,000; this sum he estimates is equal to the loss of income resulting from the failure of the business to yield current rates of interest on the investment from the beginning of the business until the year 1880; the value of the going business he thus measures by the deficiency of revenue prior to 1880.

Mr. Duryea measures the value of the property by his estimated cost of a substitute system for supplying San Francisco with water. He says the total cost to San Francisco of a water system collecting 50,000,000 gallons of water per day from the Santa Clara catchment areas of the Bay Cities Water Company, and carrying the same to and delivering it through the city, would be $25,451,000, and the cost of a similar system delivering but 35,000,000 gallons (the average present capacity of the Spring Valley plant) would not exceed $20,000,000.

Mr. Fitzgerald makes his estimate upon a computation of the actual reasonable primary cost of the plant, without deducting anything for depreciation of structures, or adding anything for appreciation.

Mr. Manson's valuation is based upon an actual appraisement of complainant's plant made by Mr. Grunsky with Mr. Manson's assistance in 1901 and 1902. Their investigations preparatory to their report and appraisement, extended over a period of two years, and involved a personal examination of the company's properties. Mr. Manson adopts this appraisement, and the subsequent valuations prepared by the city engineer's office for the board of supervisors, but fails to make any allowance for intangible property, such as franchise or going business. He also considers the reports submitted by the Spring Valley Water Company to the board of supervisors, covering betterments and other expenditures since the date of Mr. Grunsky's appraisement. The valuation in 1906 was $25,450,320. A reduction of $880,492 was made in the estimate for the following year on account of earthquake damages. To the valuation of 1907—$24,569,828—he added $355,493.21, reported by the company for permanent improvements and betterments, thus making his estimated value of the works in use for the year 1908 $24,925,321. Mr. Manson with this valuation also reported additional outlays by the company amounting to $335,312.92, which he did not accredit to the value of the plant because these expenditures were for repairs and replacements made necessary by the earthquake.

Mr. Dockweiler, consulting engineer to the city attorney of San Francisco in all matters pertaining to water rates and water supply, says that he has devoted more than two years to studying and investigating the books, records, and properties of the Spring Valley Water Company. Mr. Dockweiler obtained his valuation by esti-

mating the present cost of "reduplicating the structures," and "apraising the lands and water rights at their present value"; to the sum of these estimates, $23,192,656, he has added $1,678,982.25 for additional constructions reported by the Spring Valley Water Company for 1904, 1905, 1906, and 1907. He testifies that in the Peninsula system of the Spring Valley Water Company and in the Pilarcetos, San Andreas, and Crystal Springs watersheds there were, in 1904, 18,859.94 acres of land which cost, according to the reports of the Spring Valley Water Company, $1,231,139.23, or an average price per acre of $65.28. Mr. Dockweiler appraised these lands at $1,461,475, and the water rights at $1,438,400. The Alameda system contains 23,400 acres of land; this, with the water rights, cost $2,-116,718.91. Mr. Dockweiler appraised this property as follows: 23,-400 acres at $70 per acre, $1,638,000, 17,000,000 gallons daily supply of water at $77,400 per million gallons, or $1,000 per miner's inch, $1,315,800—total, $2,953,800. The Merced ranch contains 2,-730 acres. Mr. Dockweiler appraised this property at $1,000 per acre for the land, and $77,400 per million gallons for the water. The total land and water rights together he values at $2,831,500.

Mr. Schussler appraises the constructed works of the company, such as reservoirs, pipes, conduits, pumping stations, city distributing system, wells, filter beds, meters, stock on hand, city real estate, Lake Merced lands, land at the pumping plants, and the rights of way, at $26,418,000. He computes the combined value of all complainant's reservoir sites, watersheds, artesian and filter bed lands and water rights belonging to the Peninsula and Alameda systems, including water rights to the outflow of Lake Merced (measured by the estimated cost of the Tuolumne system), at $30,150,000. The computation is made thus: Mr. Grunsky's estimated cost of that portion of the Tuolumne system which extends from the proposed receiving reservoirs in the southern part of San Francisco county to and including the headwater reservoirs was $30,724,000. Mr. Schussler adds to this, for additional estimated cost of the pipe, $12,694,000; and, for interest during construction, $5,000,000—total, $48,418,000.

Mr. Schussler estimates the value of the corresponding portion of the Spring Valley Water Company's constructed works, extending from its three receiving reservoirs, Lake Honda, College Hill, and University Mound, to the headwaters of the Alameda system and the Peninsula system, including the cost of completing 12 miles of a 54-inch safety pipe line from Crystal Springs to Ocean View pumps, at $18,257,000. The difference between these two estimates—$30,150,-000, in round numbers—is Mr. Schussler's estimate of the unit value of the Spring Valley headwater lands and water rights, including the Lake Merced water right.

The following table shows approximately the valuations of the Spring Valley properties given by Mr. Dockweiler, Mr. Schussler, Mr. Herring, Mr. Schuyler, and the city engineers. The city engineers' estimate was adopted by the board of supervisors. The sixth column shows the difference between the estimates of Mr. Dockweiler and Mr. Schussler.

| | 1 Grunsky & Manson Estimates | 2 Schussler Estimates | 3 Dockweiler Estimates | 4 Schuyler Estimates | 5 Herring Estimates | 6 Difference Between 2 & 3. |
|---|---|---|---|---|---|---|
| Structures such as pipes, reservoirs, pumps, etc. | $15,887,521 | $17,134,190 | $13,831,948 | $15,586,788 | | $3,302,242 |
| Meters | | 150,009 | | | | 150,000 |
| Interest, engineering, contingencies, etc. | | 2,655,810 | 1,519,120 | 2,838,018 | | 1,136,690 |
| Stock on hand | 126,200 | 395,000 | 270,000 | | | 125,000 |
| Total structural value | $16,013,721 | $20,335,070 | $15,621,068 | $17,924,806 | | $4,713,932 |
| City reservoir sites and real estate | 1,609,000 | 1,366,090 | 567,395 | | | 798,605 |
| Lands and water rights in Peninsula, Lake Merced & Alameda systems | 7,302,000 | 34,245,000 | 8,685,175 | 28,036,000 | | 25,559,825 |
| Rights of way | | 622,000 | | | | 622,000 |
| Total value Spring Valley property | $24,925,321 | $56,568,060 | $24,873,638 | $45,960,806 | $44,770,900 | $31,694,362 |
| Estimated cost Tuolumne system by Mr. Grunsky | $39,531,000 | $39,531,000 | $39,531,000 | $39,531,000 | $39,531,000 | |
| Alleged deficiency in Mr. Grunsky's estimate. Interest, Cost of pipe, " pumps, " conduit | | 5,000,000 12,694,000 | | 6,741,615 6,420,700 198,500 1,998,194 | 2,800,000 12,690,000 | |
| Total substitute system | $39,531,000 | $57,225,000 | $35,304,360 | $54,895,009 | $35,021,000 | |

Mr. Schussler's valuation of the company lands and water rights is $25,559,825 higher than Mr. Dockweiler's, and nearly $27,000,000 higher than the estimate adopted by the board of supervisors. Mr. Dockweiler appraises the Lake Merced lands at $1,000 per acre, the remaining lands at about $80 per acre, and the water rights at $77,400 per million gallons of daily output, or $1,000 per miner's inch. Mr. Schussler measures the value of lands and water rights by his estimated cost of the Tuolumne system; that is, he deducts from $48,418,000, estimated cost of the Tuolumne system outside of San Francisco, $18,257,000, value of certain Spring Valley property, and arrives at the result, $30,150,000, as the value of the Spring Valley lands and water rights. If Mr. Grunsky's estimate of the cost of that system is correct, Mr. Schussler's total valuation must be reduced $17,694,000, or from $56,568,000 to $39,126,000, and his unit value of lands and water rights from $34,245,000 to $16,569,000; or, excluding Lake Merced lands from $30,150,000 to $12,474,000; and, if Mr. Dockweiler's estimate of the total cost of the Tuolumne system is correct these values for land and water must be further diminished by $2,726,000. The intangible value found by Mr. Herring will shrink to nothing if Mr. Grunsky's estimate is correct.

Mr. Schuyler estimates the original cost of Spring Valley lands and water rights at $11,539,000. In order to ascertain how much they have appreciated in value, he subtracts the amount invested in the Spring Valley properties, as estimated by him, from his estimated cost of the Tuolumne system, and obtains $16,497,000 as the total appreciation. As this depends upon his estimated cost of the Tuolumne system, which he has obtained by adding $15,364,609 to Mr. Grunsky's estimate, if the latter is correct, this estimated increase in the value of the lands must be correspondingly reduced.

The Grunsky estimate is claimed to be deficient in that he fails to allow for interest during the period of construction, and underestimates the cost of pipe. Mr. Grunsky estimates that 272,664,000 lbs. of iron pipe will be required for the construction of that portion of the Tuolumne system between Dry Creek power station and San Francisco, and that it will cost, in the ground and ready for service, $19,-098,420, or a little over 7 cents a pound. Mr. Schussler and Mr. Herring say that it will cost about $31,792,620, or 11.66 cents per pound laid in the ground and ready for service. Mr. Schuyler says it will cost about $25,525,120, or about 9.3 cents per pound. Mr. Dockweiler says that, by substituting steel for iron pipe, there can be a saving of one cent per pound, and that the cost will be but $16,371,780, or about 6 cents a pound. He also says that "the cost of Eastern steel pipe has been in some cases less than 5 cents per pound complete; that those estimated for New York and Los Angeles have been in the neighborhood of 5 cents per pound complete."

Mr. Schussler's estimated present worth of all the Spring Valley constructions, meters and stock on hand, including engineering and contingencies, is $20,335,000. He says that the "constructed works of the complainant are worth what they would cost if they were to be constructed now under the present conditions of cost of materials and

labor, and of the same character of materials and workmanship used and employed in their construction."

The testimony of J. H. Dockweiler, Robert Higgins, J. S. Emery, John Carey, and Mr. Wenzelburger tends to show that the original cost of these structures, some of them built 30 or 40 years ago, was much less than Mr. Schussler's estimate of the present worth, and thus justifies the inference from Mr. Schussler's language that his estimates are for actual present cost without deduction for deterioration. If this be true, Mr. Schussler's estimates lend but little support to the company's claim to an annual allowance of $260,000 for depreciation.

## Value of Property Measured by Substitute System.

Even if permissible, a valuation of the plant based on the estimated cost of the next available substitutional system is at best problematical. There may be other equivalent substitutes which are cheaper. We must reckon, not only with the uncertainties of the estimate itself, with the relative serviceability and permanency of the substitute system, with the relative quantity and quality of water which it is capable of furnishing, but also with undiscovered and overlooked elements which may greatly affect the cost. There is, however, a still more serious objection to this method of valuation. To say the value of the Spring Valley land and water rights for rate-fixing purposes is to be measured by the cost of the Tuolumne system, is to say that the price of Spring Valley water should be fixed by comparison with the cost of bringing water from Hetch-Hetchy. The same method was applied to railroad charges when rates were based on the cost of hauling freight by mule teams, that mode of transportation being the next most available substitute.

The owner of private property sets the price at which others may buy or use it; he cannot be compelled to accept less; this is his right of contract: but when he devotes his property to public use, he must submit to the right of the public to regulate his compensation for such use down to what is just both to himself and to the public, and that compensation is to be based, not on the cost of the next available substitute, but on a fair, reasonable value of the property at the time it is used for public convenience. While the cost of a substitute system may be considered in finding the reasonable value of the Spring Valley plant, it cannot be a controlling element. Otherwise, by securing control of all available sources from which water can be brought to San Francisco, the company might force a greatly exaggerated value upon its plant for rate-fixing purposes, and thus absolutely defeat the very object of government regulation.

The value of water as a necessity of life is simply incalculable. San Francisco must have it at any price. Nature has provided a source of supply in the immediate vicinity. This supply, according to the complaint, is sufficient for the present needs of San Francisco with 400,000 population, and, with development in the way of dams and conduits, it will be ample when San Francisco's population is 2,000,000. "A community is * * * entitled to the benefit of such natural and sufficient facilities for procuring pure water as exist in its vicinity. Com-

munities are in every respect entitled to the benefit of existing natural advantages," says Judge Savage in Water District v. Water Co., 99 Me. 371, 387, 59 Atl. 537, 543. If it be said that San Francisco did not secure these natural advantages, these water rights and watershed lands, but suffered practically all the nearby sources of water to pass into the ownership of complainant, the answer is, these water rights were secured for public service; they are devoted to public service; they have little commercial value for any other purpose; they were acquired under a law which permits reasonable public control of such property for the public good, and that law was old when in Aldnutt v. Inglis, 12 East. 527, 537, it was said:

"Though this be private property, yet the principle laid down by Lord Hale attaches upon it, that when private property is affected with a public interest it ceases to be juris privati only; and, in case of its dedication to such a purpose as this, the owners cannot take arbitrary and excessive duties, but the duties must be reasonable."

On this subject Mr. Justice Savage further says:

"It therefore seems to be reasonable that a public water service company undertaking to supply a community with water is bound to do so wisely and economically. It is bound to take advantage of practicable natural facilities. If there is more than one source of supply, other things being equal, the community is entitled to have the least expensive one used. So long as the company enjoys practically exclusive franchises, so long it must afford the community the benefit of the conditions which nature has provided for them. For instance, if water can profitably be served from a nearer source of supply, at a certain rate, the company ought not to be permitted to charge a higher rate based upon the expense of bringing it from a farther and more expensive source." Water District v. Water Co., 99 Me. 371, 387, 59 Atl. 537, 543.

### Franchise and Going Business.

That a franchise is property has been declared by the Constitution, and affirmed repeatedly by the Supreme Court of the state of California. Const. Cal. art. 13, § 1; Stockton Gas Co. v. San Joaquin County, 148 Cal. 313, 83 Pac. 54, 5 L. R. A. (N. S.) 174. The Constitution also provides that all property in the state not exempt under the laws of the United States shall be taxed in proportion to its value, to be ascertained as provided by law. Const. Cal. art. 13, § 1. Accordingly, from the fiscal year 1890–91 to and including the fiscal year 1906–07, complainant's franchise was assessed by the assessor of the city and county of San Francisco at figures varying from $1,500,000 in 1890–91, to $7,821,375 in 1905–06. The franchise was not assessed for the fiscal year 1907–08, nor is it assessed for the present year. The franchise of the company, then, is not only property, but, for the purposes of taxation, it has been so treated by the city and county of San Francisco.

Complainant contends that its franchise and going business have an intrinsic value of more than $4,000,000, which should be added to the value of the tangible or physical property for rate-fixing purposes. Defendants deny that either element has any value, and also deny the company's right to have them or either of them treated or considered as of any value in fixing and establishing rates for the present fiscal year. That a franchise is property, "taxable, inheritable, alien-

able, subject to levy and sale on execution, to condemnation under exercise of the right of eminent domain, and invested * * * with the attributes of property generally," is undoubtedly sustained by the great weight of authority. Monongahela Navigation Co. v. United States, 148 U. S. 312, 13 Sup. Ct. 622, 37 L. Ed. 463; Consolidated Gas Co. v. New York (C. C.) 157 Fed. 849, 875. The fact that a franchise has been acquired from the municipality by gift or without adequate compensation may evidence lack of foresight, or something worse, on the part of the municipal government, but it can have no effect on the present problem. The franchise, however acquired, must be considered in determining reasonable rates for the use of property devoted to public service, otherwise it would be possible to practically destroy or confiscate its value. When property used under a franchise is condemned, the whole property is taken. The franchise is paid for as well as the physical property. The idea that a valuable franchise could be taken in condemnation proceedings, without compensation, would not be tolerated for an instant; and to permit such a franchise to be taken without consideration, indirectly, by means of rate regulation, is equally obnoxious to the federal Constitution. These views will find support in the following cases: Spring Valley W. W. v. San Francisco (C. C.) 124 Fed. 574, 587, 594; Consolidated Gas Co. v. Mayer (C. C.) 146 Fed. 150, 157; Consolidated Gas Co. v. New York (C. C.) 157 Fed. 849, 872. It also appears to be the law that whatever discoverable value may attach to the concern as a going business is proper to be considered in determining the value of complainant's plant for rate-fixing purposes. National Waterworks Co. v. Kansas City, 62 Fed. 853, 865, 10 C. C. A. 653, 27 L. R. A. 827; Spring Valley W. W. v. San Francisco (C. C.) 124 Fed. 574, 595.

Serious and perplexing questions arise when it is attempted to ascertain the value of the franchise and going business. Here very little has been settled by the courts, except that each case must depend on its own special circumstances. A franchise such as we have to deal with is thus defined in section 2, art. 14, of the Constitution of the state of California:

"The right to collect rates or compensation for the use of water supplied to any county, city and county, or town, or the inhabitants thereof, is a franchise, and cannot be exercised except by authority of and in the manner prescribed by law."

The value of the franchise, then, is the monetary value of the right to collect water rates. What, then, is it worth to complainant to collect water rates from the people of San Francisco? This question must ultimately be decided in the light of all the circumstances and conditions. The burden of proof is on complainant. Complainant must, if it wishes its franchise and going business to be treated as things of definite value, establish that value. Capital City Gas Co. v. Des Moines (C. C.) 72 Fed. 818, 822. It is not the duty of the court, nor was it the duty of the supervisors, to give value to the franchise, and add that value to the value of the physical property, unless it first appeared that the franchise had an intrinsic productive value of its own. Their duty was and is to measure the disclosed

and apparent value of the franchise. In 1858 there was an act of the Legislature of California under which certain predecessors of complainant were authorized to collect water rates which would yield an income of not less than 20 per cent. per annum on the actual capital invested in the waterworks. If complainant were now operating under such a law, its franchise would be immensely valuable, and that value could be readily ascertained by computations based on the difference between 20 per cent. and the prevailing rate of interest. When the prevailing rate of interest is 7 per cent., a franchise which will enable its owner to collect 20 per cent. net on his investment is valuable. But, on the other hand, when the prevailing rate of interest is 20 per cent., a franchise under which the owner can realize but 7 per cent, has very little value. "It is obvious * * * that either for the purpose of condemnation or regulation the value of a franchise depends wholly upon what is earned under it. * * * The best way of finding out how much a franchise separately considered is worth is to ascertain what those persons desirous of continuing operations under it consider it to be worth." Consolidated Gas Co. v. New York (C. C.) 157 Fed. 849, 878; Monongahela Nav. Co. v. United States, 148 U. S. 312, 329, 13 Sup. Ct. 622, 37 L. Ed. 463; Kennebec Water Dist. v. Waterville, 97 Me. 185, 54 Atl. 6, 19, 60 L. R. A. 856; Montgomery Co. v. Bridge Co., 110 Pa. 54, 59, 20 Atl. 407, 408. In the last case the court said:

"Their (referring to franchises) value necessarily depends upon their productiveness. If they yield no money return over expenditures, they would possess little, if any, present value. If, however, they yield a revenue over and above expenses, they possess a present value, the amount of which depends in a measure upon the excess of revenue. Hence it is manifest that the income from the bridge was a necessary and proper subject of inquiry before the jury. The court permitted the plaintiff to prove the receipts for, say, five years before the taking, but denied the defendants permission to extend the inquiry back to the time of the organization of the company. We perceive no error in this ruling."

How much has this franchise yielded to complainant and its predecessors above going rates of interest? In 1907 there was no dividend, the net income after paying taxes and operating expenses was but 4.12 per cent. on a valuation of $24,369,828; in 1906 it was 3.02 per cent. on a valuation of $25,450,320; in 1905 it was 5.4 per cent. on a valuation of $25,001,441; in 1904 it was 5.23 per cent. on a valuation of $24,672,512; in 1903 it was 5.12 per cent. on a valuation of $24,124,309; in 1902 it was 5.27 per cent. on a valuation of $24,-468,210. These valuations are less than the actual cash invested. Complainant claims that its aggregate net income since the initial investment has been more than $25,000,000, less than the aggregate interest which the same investment would have yielded in the same time at current rates of interest. It appears by the complaint that the average dividends for 50 years have been 4.938 per cent. per annum, while during the same period the average rate of interest has been 9.6 per cent. per annum. Mr. Adams, testifying in behalf of the complainant, says that the deficiency in revenue prior to 1880—that is, the amount by which actual dividends fell short of interest,.

computed at current rates on actual stock investment—was $5,671,-509; he also says that between 1880 and 1900 there was no "provision made at all for the creation of a renewal and abandonment fund, but only enough revenue allowed to pay 4 per cent. upon the actual investment in the property." The percentages range from a minimum of 2.4 per cent. in 1883 to a maximum of 4.8 per cent. in 1880, and the average for the entire period of 20 years was exactly 4 per cent. per annum. It would seem from this that Spring Valley revenues have never been adequate to yield anything in excess of a fair return upon the capital actually put into the plant. There has been no income which might be credited as earnings to the franchise in addition to and above what is apparently a scant reward for actual capital invested. The conditions thus disclosed do not necessarily predicate unfair action by the board of supervisors. It may be that the water company itself has been extravagant, or that its investments have been larger than the needs of San Francisco demanded.

If the company could be assured of a certain income for a definite number of years, stability would be given to the investment, and probably the franchise and going business would become exceedingly valuable; but this is impossible under a law which requires annual adjustment of water rates. The value of the franchise and going business depends upon their earning power. Their earning power depends on the rates, and the rates at the present time are regulated by the board of supervisors. If the board establishes rates higher than an adequate return for the physical plant requires, either by increasing the rate of income or by adding to the value of the plant itself, an earning power, and consequently a value, is thus given to the franchise and going business, in addition to and above the earning power and the value of the physical plant. If, when the franchise was acquired, or at any subsequent time, the city entered into a contract with the company providing for definite rates of income, and this agreement is now binding, and gives a present value to the franchise; or if, for a number of years, the aggregate market value of the stock and bonds of the company has exceeded the actual value of the physical plant; or if, as in Consolidated Gas Co. v. New York (C. C.) 157 Fed. 849, 878, the franchise was capitalized for some fixed sum, say $100,000, the actual cash invested was $100,000, and $200,000 worth of stock was issued, which has maintained itself at par and paid satisfactory dividends on the whole amount of stock for a number of years —it would be very easy to determine whether the franchise has value, and what that value is. But here it does not appear that the franchise is defined by any specific contract with the city; neither is it an exclusive franchise; and it is not shown that the market value of the stock and bonds ever exceeded the value of the physical property. The water company's system, in so far as it is now in service, and possibly in so far as it will be presently serviceable, is to be treated as a unit. It probably has a value as a whole which exceeds the sum of the values of its several physical elements and characteristics. That value is affected by the franchise, by the fact that the concern is a going business. The plant operated under a franchise, a legal right

to collect water rates, is more valuable than without such a right; and a plant with an established business, with customers who have connected their houses with the company's distributing pipes, is more valuable than it would be without such connections and without such customers. These facts, as well as all other discoverable elements of value, should be weighed, but it must be remembered that while the rate-fixing agency is in duty bound to establish rates which will afford a reasonable compensation for the use of this plant at a fair valuation as affected by the fact that it is a going business and operated under its franchise, there is no duty to go beyond this and confer an additional value for these intangible elements, which is neither discoverable nor apparent. If the franchise and going business have ever had a distinct, independent, productive value, it should appear somewhere or at some time in an exhibition of distinct earning power. If it be assumed that the net annual income of the Spring Valley plant for 50 years past has been but 5 per cent., it is conceivable that the property without any franchise, and without any going business in San Francisco or in any other municipality, could not have earned more than 3 per cent. This difference of 2 per cent. might fairly be considered as representing the earning power of these two elements, and as the controlling factor in calculating their value. In fixing rates this difference is to be considered as a part of the 5 per cent.; it is not to be added to it, because that would be to make a gift, to create, not to find, value. The mere fact that a franchise has been given and is in operation lays upon the municipal government, no duty which was not present when the franchise was originally acquired to add to its value.

The argument that the franchise ought to be worth something for rate-fixing purposes if it is worth millions for taxation is not without force. The value fixed by the assessors, however, is not admissible as evidence of value in condemnation proceedings. Lewis on Eminent Domain, § 448. And such evidence is of little worth here. If the aggregate value of the franchise and physical property as assessed did not exceed the total valuation for water rates, the company suffered no injustice. Valuations of the franchise and going business which are ascertained by taking a certain percentage of the estimated cost of reconstructing and reacquiring the Spring Valley property, and of the value of the city distributing system, seem to ignore the effect of the profitableness of the business on these elements. Both elements are certainly worth much more if the plant is operated at a profit than if it be conducted at a loss. A valuation of the going business which is found by taking one-third of the difference between the estimated cost of the proposed Tuolumne system and the valuation of the Spring Valley tangible property does not commend itself by showing any apparent ratio to the earning power of the business itself, and is subject to every objection which can be made to measuring the present value of a thing which is in actual existence by the estimated cost of something which is to be hereafter constructed which may possibly be an equivalent substitute.

Two of the experts estimated the value of the going business to be equal to the total amount by which current rates of interest exceeded

the net profits of the business prior to 1880. In other words, the value of the going business is equal to the cost of establishing the Spring Valley Water Company's business originally, and that cost is equal to the deficiency of revenue prior to 1880. This estimate is open to the objection that the deficiency of revenue may have been due to extravagant or wasteful management. The company may have purchased a plant larger and more expensive than necessary; current rates of interest may have been abnormally high; many causes which have absolutely no relation to the value of the company's business now as a going concern may have increased or diminished the deficiency in revenue. Furthermore, if it be conceded that early deficiency of revenue is the proper measure of value for the present going business, then it follows that, the greater the deficiency and the more unprofitable the business, the greater the present value of the going concern; and, if the business had yielded large profits from its very inception, the going business to-day would be worthless.

These variant methods, leading to equally variant results, are not in accord with the actual conditions. None of the estimates can be followed, but such valuation as the conditions justify for the two intangible elements will be hereafter amply provided for in the valuation of the property which is made for this proceeding.

### Property for Future Use.

The valuation put on this property by Mr. Schussler, like that alleged in the bill, is open to the objection that it includes a large amount of property not now in use. It is unnecessary to attempt a segregation of such property. Complainant alleges its present value to be $7,500,000; that it "cost hundreds of thousands of dollars, and is now worth millions." It is stated in the bill that it was purchased for "reasonably immediate use," but as to when that will be the record is silent, except as it may be inferred from the fact that the present daily consumption is 31,000,000 gallons, the present daily capacity 35,000,000, and it is alleged that with additional dams and aqueducts the plant will be capable of supplying water for more than 2,000,000 people. It is not just to compel consumers to pay for more than they receive, or to pay complainant an income on property which is not actually being used in gathering and furnishing water. If in this case the company, in anticipation of the growth of the city and its future needs, acquired property for future use at a cost of hundreds of thousands of dollars which is now worth millions, it has acted wisely, but it should be satisfied with the goodness of its bargain and the enhanced value of its property, without asking in addition gratuities from its customers in the way of higher rates. When the property does come into necessary service, the company is entitled to have it credited at its then fair and reasonable value for rate-fixing purposes. San Diego L. & T. Co. v. National City (C. C.) 74 Fed. 79, 83. "What the company is entitled to demand, that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public." San Diego L. & T. Co. v. National City, 174 U. S. 739, 757, 19 Sup. Ct. 804, 811, 43 L. Ed. 1154.

The statement of this rule in practically all the cases, in the present tense, is significant. In San Diego L. & T. Co. v. Jasper, 189 U. S. 439, 442, 23 Sup. Ct. 571, 574, 47 L. Ed. 892, Mr. Justice Holmes says:

"If a plant is built, as probably this was, for a larger area than it finds itself able to supply, or, apart from that, if it does not yet have the customers contemplated, neither justice nor the Constitution requires that, say, two-thirds of the contemplated number should pay a full return."

In Water District v. Water Co., 99 Me., at page 376, 59 Atl. 539, Mr. Justice Savage uses the following illustration:

"Suppose that a five-hundred horse power engine was used for pumping when a one-hundred horse power engine would do as well. As property to be fairly valued, the larger engine might be more valuable than the smaller one, yet it could not be said that it would be reasonable to compel the public to pay rates based upon the value of the unnecessarily expensive engine."

The corollary to this is, if the company sees fit to use, for the mere catchment of water, lands which are much more valuable for other purposes, it is unreasonable in fixing rates to appraise such lands for more than they are worth as watershed areas. Capital City Gaslight Co. v. Des Moines (C. C.) 72 Fed. 829, 844; Boise City I. & L. Co. v. Clark, 131 Fed. 415, 65 C. C. A. 399; Cons. Gas Co. v. New York (C. C.) 157 Fed 849, 854; Beale & Wyman on R. R. Rate Reg. §§ 343, 344, 462.

### Stocks and Bonds.

In Spring Valley Waterworks v. San Francisco (C. C.) 124 Fed. 574, decided on motion for interlocutory injunction, Judge Morrow found the total value of all the property then used in supplying San Francisco and its inhabitants with water to be $26,752,000, and that 5 per cent. per annum, net, thereon, was a just and reasonable remuneration for the service rendered. A year later, Judge Gilbert, in Spring Valley Water Co. v. San Francisco, also on motion for preliminary injunction, treated Judge Morrow's decision, particularly in relation to value and rate, as a controlling precedent. Judge Morrow's valuation was fixed by adding the sum of the bonded and floating indebtedness to the average value of the capital stock of the company for that fiscal year, and was summarized as follows:

| | |
|---|---:|
| Capital stock, then present value $84 per share | $11,700,000 |
| Bonded indebtedness | 13,975,000 |
| Floating indebtedness | 1,017,500 |
| Total | $26,752,500 |

Since that time (1903) the Spring Valley Waterworks has disposed of all its interest in the property to complainant, Spring Valley Water Company. June 15, 1903, the latter company offered to purchase from the Spring Valley Waterworks all its business, franchise, and property as a whole, subject to all outstanding incumbrances, for the sum of $11,480,000, and to issue all or any part of its capital stock to the stockholders of the old company in the proportion of two shares for each share in the Spring Valley Waterworks, and at a price of $41 per share for the stock of the new company. This offer was

not accepted. A subsequent offer in similar terms, but raising the aggregate price to $12,600,000, and the price of the stock to $90 for the stock of the old company, or $45 for the new, was accepted. The price thus fixed may be summarized as follows:

| | |
|---|---:|
| Selling price | $12,600,000 |
| Bonded indebtedness | 14,475,000 |
| Floating indebtedness | 980,500 |
| Total | $28,055,500 |

As this price included all the property of the corporation, it also included all properties not then in use, which Mr. Dockweiler estimated at $3,807,117. This sum, deducted from $28,055,500, would leave $24,247,883 as the value of property then in use.

J. M. Duke, secretary of the water company, testifies "that no valuation of the properties transferred was made, and their value was not considered at the time of the sale"; that the Spring Valley Water Company was organized for the purpose of taking over the properties of the Spring Valley Waterworks, and also for the purpose of increasing the capitalization to such a point that a larger bond issue would be possible under the laws of the state of California.

At the beginning of this suit the par value of the bonds and stock of the company was as follows:

| | |
|---|---:|
| 280,000 shares of stock | $28,000,000 |
| Bonded indebtedness | 17,859,000 |
| Floating debt | 75,190 |
| Total | $45,934,190 |

During the year ending June 1, 1908, the average market price of the stock was but $21.46, and the average market price of the bonds was $83.39. During the month of May, immediately preceding the suit, the prices were $22.50 for the stock and $82.62½ for the bonds. Thus the total market value of bonds and stocks of the company added to the floating debt was as follows:

| | |
|---|---:|
| 280,000 shares of stock at $22.50 | $ 6,300,000 |
| $17,859,000 in bonds at $82.62½ | 14,755,988 |
| Floating debt | 75,190 |
| Total | $21,131,188 |

This represents the present value of all the property of the company, whether in use or not, as measured by the market value of its stock and bonds. If the actual intrinsic value of the property is more than $52,500,000, as alleged in the bill, by deducting the total indebtedness, $17,934,190, the remainder, $34,565,810, will be the net value of the property which was then represented by the stock.

It seems hardly believable that a property worth $34,500,000, net, could for a whole year have an average value of less than $6,300,000 in the stock market. True, the market quotation of stocks and bonds is not always a correct index of value; such prices often go up and down without much regard to the intrinsic worth of the property represented, yet it seems to be clear, under the authorities, that, in order

to ascertain the fair value of the property being used by the company for the public "the amount and market value of its bonds and stock" are "matters for consideration, and are to be given such weight as may be just and right." Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; Ames v. Union Pac. Ry. Co. (C. C.) 64 Fed. 165; Cotting v. Kansas City Stock Yards Co. (C. C.) 82 Fed. 850; Spring Valley Waterworks v. San Francisco (C. C.) 124 Fed. 574, 596. It is shown in the bill that the stock for a long time prior to February 1, 1901, and before the rate litigation, had an average market value of $97. This is but 6 points below the highest price ever reached by the stock, and is equivalent to $48.50 per share for the stock of the present company. It also appears that the company has property "purchased for reasonably immediate use," but not now in service, of the value of $7,500,000. Mr. Dockweiler testifies that on January 1, 1904, properties costing the company, according to its construction account, $4,044,670.61, had gone out of or had never come into use. In this he does not include Arryo Valle lands, some 4,400 acres, purchased for future use, nor lands held by trustees.

Bearing these matters in mind, the present value of the property, measured by the stock at $48.50, and bonds at par, may be summarized as follows:

| | |
|---|---:|
| 280,000 shares of stock at $48 50 | $13,580,000 |
| Bonded indebtedness | 17,859,000 |
| Floating debt | 75,190 |
|    Total | $31,514,190 |
| Deducting from this for property not in use | 4,000,000 |
| We have the net value of the property in use | $27,514,190 |

## Original Cost.

Capt. Payson, president of the company, states that the actual expenditure for the creation of the Spring Valley system was over $28,-000,000. Mr. Duke, secretary of the company, places the amount at $29,037,947.44, apportioned thus:

| | |
|---|---:|
| Original investment to December 31, 1904 | $ 9,177,496 82 |
| Assessment in 1906 | 840,000 00 |
| Improvements in 1905, 1906 and 1907 | 1,161,450 62 |
| Bonded indebtedness May 31, 1908 | 17,859,000 00 |
|    Total | $29,037,947 44 |

Mr. Dockweiler says that, up to and including the year 1907, the amount was as follows:

| | |
|---|---:|
| Actual cash capital paid in | $10,017,496 82 |
| Bonded debt | 17,859,000 00 |
| Floating debt | 75,190 20 |
|    Total | $27,951,687 02 |

He also says that, according to the construction account and reports of the company, the total cost of property used and useful Janu-

ary 1, 1908, was $24,059,896.15, and the cost of property not in use January 1, 1904, was $4,044,670.61; total, $28,104,566.76. If we deduct from the total cost the cost of properties out of use, or purchased for future use, we shall have approximately $25,000,000 as the cost of properties now in use. Of this amount a large portion went into the construction and replacement of perishable portions of complainant's plant, such as water pipes, buildings, flumes, reservoirs, and pumping plants. The present worth of these constructions, according to the experts, is as follows: Mr. Schussler, $20,335,000; Mr. Dockweiler, $15,621,068; Mr. Schuyler, $17,924,806; Mr Manson, $16,013,721.

Flumes and buildings decay, iron rusts, machinery wears out and reservoirs gradually fill up with silt. Mr. Adams, Mr. George R. Webster, and Mr. Schussler agree that in order to keep the original investment good, and to make up for this slow destruction of the constructed portions of the system, complainant is justly entitled to an annual allowance of $260,000, consequently it is unreasonable to believe that these constructions, many of which were made 30 or 40 years ago, are worth as much today as they originally cost.

The company claims to own about 49,000 acres of land in the Peninsula and Alameda systems, or about one-tenth of the watershed area which feeds the reservoirs, filter beds and artesian wells. 18,859.94 acres of the Peninsula system cost $1,231,139.23, or $65.28 per acre; 23,400 acres of the Alameda system, with the water rights, cost $2,-116,718.91, or $90.40 per acre, for both water and land. The remainder of the total acreage is not in present use. The prices paid for Alameda lands since 1899 range from $10.06 per acre for a very large tract to $512 for a 4-acre piece. The total cost was $3,347,858.14. This property, except 2,310 acres of reservoir land in the Peninsula system, 1,800 acres of artesian land and filter bed, and 1,300 acres of reservoir site of the Alameda system, is rough, hilly land, and, in the main, wholly unsuited to tillage. It is too far away from the centers of population to be in demand at the present time for anything but pasturage or shedding water. To the ordinary observer, it is simply wild, unimproved land, and fit only for pasturage. This property is appraised by Mr. Dockweiler at $5,853,675; that is, at the rate of $1,000 per miner's inch, or $77,400 per million gallons of daily water capacity, and $78.99 per acre for the land. There is little testimony as to recent prices paid for land and water in this vicinity, but such as there is indicates moderate appreciation. The value which complainant has added to the property is in the plant which intercepts and stores the drainage of these watershed lands, in the development of water, in the strategic situation of the lands selected for water gathering, and in the fact that such a large area, about 70 square miles, is under one ownership and one control, making it possible at the present time not only to control the output of 700 square miles, but to take such measures as are requisite to guard the water from pollution. In Pasadena, Cal., where water was relatively scarce, 10 years ago it was appraised at $1,000 per miner's inch. The authorities of the city of Los Angeles set the same value on water when delivered. Mr. Herring appraises the Spring Valley water at $150,000 per million gallons

of daily delivery, while Mr. Grunsky appraises the Alameda water supply at but $40,000 per million gallons of daily delivery. The original cost of the 2,730 acres in Lake Merced ranch does not appear, but the proximity of this tract to the city gives it a value far in excess of its value as a watershed. Mr. Dockweiler has appraised this property at $2,831,500 for water-producing and water-storing purposes. The lake itself, as a nearby storage for water, is a valuable adjunct to the system. Mr. Baldwin testifies that the property, exclusive of improvements would sell for at least $4,000,000.

## Present Value.

It is unnecessary to pursue this line of inquiry further; it can lead to no definite results because of the necessarily incomplete and inconclusive character of the testimony On final hearing, when all the facts will be presented and the witnesses subjected to cross-examination, it may be possible to arrive at conclusions which will be satisfactory, at least to the court. At the present time, in fixing the probable, fair and reasonable value of the property, whether we consider the market value of the stock and bonds of the company before the beginning of the rate litigation, or whether we consider the original cost of the lands, water rights, and improvements, after weighing the increased cost of labor and materials, the deterioration of structures caused by use, and the ordinary action of the elements, and the fair increase in the value of real estate and water rights, as shown by recent prices paid for similar or the same property, it is not easy to escape the conclusion that the value fixed by the board of supervisors is too low; that the value fixed by Judge Morrow in the 1903 case, $26,752,500, was not then too high.

## Earthquake Damages and Investment Since 1903.

Since 1903 a large sum of money raised by assessment and the sale of bonds has been expended on improvements, but how much of this expenditure was in the purchase of property for future use or for replacements, or how much was made necessary by the earthquake and fire, does not clearly appear. Neither has it been shown that complainant was entirely free from fault in permitting its feeder pipes in the lower part of the city to remain in swampy and loosely filled ground. It was in and on such ground the earthquake wrought its greatest havoc. There is unexplained and unanswered testimony tending to show, not only that it was possible to have placed main feed pipes on a solid foundation, but that the chief engineer of the company, realizing the danger years before the disaster, urged the construction of a system on proper ground. It is difficult to understand why the consequences of such ill-advised location of pipe lines should be visited on the public and not on the company. There is always a certain amount of loss by accident, which seems to be inseparable from the conduct of many kinds of business; it usually can be counted on in advance, and no amount of care or precaution will entirely eliminate

it; it is incident to the business. Such losses are considered by the Interstate Commerce Commission in fixing rates, but the rule is never applied in favor of a carrier who has suffered loss by reason of defective appliances and facilities which he has knowingly used or provided. New Orleans Livestock Exchange v. T. & P. R. Co., 10 Interst. Com. R. 327, 330. Therefore, in order to meet the changes which have occurred since 1903, in the absence of any testimony clearly showing that a larger amount ought to be allowed, the difference between the valuations adopted by the city engineer's office for the years 1903 and 1908 will be added to the $26,752,500, making the value of complainant's property which is found for the purposes of this proceeding $27,553,512. On the showing which has been made, there is a real and substantial controversy as to whether complainant is not justly entitled, for rate-fixing purposes, to the valuation thus fixed. A higher amount is not warranted by the testimony.

## Depreciation.

This brings us to the question as to whether a gross income which provides only for taxes, operating expenses, and what is at best but fair interest on the present value of its property now in use, is altogether fair to the company. Suppose a man says to his neighbor: "I have had your thousand dollars for years, I have paid you 5 per cent., $50 interest regularly each year; your money is now lost, I haven't got it; if you will replace the money and let me have another thousand dollars, I will continue to pay you $50 per year; I can't pay interest on the first thousand dollars because it is gone, and therefore I am no longer using it, and it is not right for you to exact interest on money which I am not using." A large portion, possibly half, of the Spring Valley property now used in supplying water to San Francisco is perishable. At the end of the time which measures their life, the pumps and water mains which have cost the company millions of dollars will go to the junk pile. Can the city then say to the company: "Replace the pumps and the watermains with new pumps and new mains, so that we may have water, and you shall continue to enjoy an annual income of 5 per cent. net on the value of the new pumps and watermains; we can pay you nothing more on account of the money which was expended in purchasing and installing the old pipes and pumps, because we are only to pay you for that which we use?" This is to assume the attitude of the man who pays the interest, but who does not pay the principal of his indebtedness.

An ordinance fixing the compensation for perishable property devoted to public use which fails to make any provision for physical depreciation of such property, and to keep the original capital intact, is unjust to the owner. It has been held repeatedly that in fixing rates the depreciation of the plant from natural causes resulting from use should be taken into consideration. San Diego L. & T. Co. v. Jasper, 189 U. S. 439, 442, 23 Sup. Ct. 571, 47 L. Ed. 892; San Diego L. & T. Co. v. National City (C. C.) 74 Fed. 79; Spring Valley Waterworks

v. San Francisco (C. C.) 124 Fed. 574, 599; San Diego Water Co. v. San Diego (dissenting opinion by Chief Justice Beatty) 118 Cal. 557, 588, 50 Pac. 633, 38 L. R. A. 460, 62 Am. St. Rep. 261; Beale & Wyman on R. R. Rate Reg. § 430. In San Joaquin & King's River C. & I. Co. v. County of Stanislaus (recently decided in this court by Judge Morrow) 163 Fed. 567, it appeared that the complainant's works were suffering considerable deterioration, but the rates in question made no provision therefor. It was held the rates were unreasonable and unjust for that reason, if for no other. San Joaquin & King's River C. & I. Co. v. County of Stanislaus (C. C.) 163 Fed. 567; Long Branch Com'rs v. Tintern Manor Co., 70 N. J. Eq. 71, 62 Atl. 474, 478; Brymer v. Butler Water Co., 179 Pa. 231, 251, 36 Atl. 249, 36 L. R. A. 260. While there is considerable testimony as to depreciation, the proper amount to be allowed for that element is not free from difficulty. Mr. Adams, Mr. Webster, and Mr. Schussler testify that $260,000 per annum is a proper allowance. But in view of the testimony showing such a relatively high present value for the perishable property as compared with its probable original cost, the allowance will be arbitrarily fixed for the present proceedings at $160,000.

### Taxes and Operating Expenses.

Taxes for this fiscal year have been estimated at $375,000, and operating expenses at $600,000. No testimony has been offered showing these figures to be excessive or improper; they were accepted as fair by the board of supervisors, and in this proceeding they will be deemed just.

The foregoing considerations, then, lead to the conclusion that the water rates for the present fiscal year should provide for income as follows:

| | |
|---|---:|
| Operating expenses | $ 600,000 00 |
| Depreciation | 160,000 00 |
| Taxes | 375,000 00 |
| 5 per cent. income on $27,553,512, approximate present value of the property | 1,377,675 60 |
| Total gross income | $2,512,675 60 |

The income of 1907, under the 1902 rates, was $1,932,778.58. Mr. Booker, chief clerk of the company for many years, estimates the income for the present fiscal year at $2,246,000. It has been claimed for the defendants that the business of this year will show an increase of 15 per cent. above that of 1907, and that the income of the present year will amount to $2,395,045. No substantial basis is suggested for such an estimated increase. It is too speculative to form a foundation for judicial action.

The following table shows the income of the company for each year, beginning with 1902: In column 1 appears the gross income from all sources; in column 2, the gross income from sales of water; and in column 3, net income after paying taxes and operating expenses. In passing it is proper to say that $571,751.13, expended by the com-

pany for "extraordinary replacement" in 1906 and 1907, is not included in the operating expenses of those years.

| | | 1 | 2 | 3 |
|---|---|---|---|---|
| 1902 | | $1,980,651 | $1,933,192 | $1,289,808 |
| 1903 | | 2,075,983 | 2,020,334 | 1,235,004 |
| 1904 | | 2,212,303 | 2,070,765 | 1,291,954 |
| 1905 | | 2,299,765 | 2,226,260 | 1,359,446 |
| 1906 | | 1,535,782 | 1,492,322 | 769,012 |
| 1907 | | 1,932,778 | 1,870,560 | 1,013,737 |
| 1908: | Estimate by supervisors | 2,395,065 | 2,334,584 | 1,420,065 |
| | Estimate by company | 2,246,000 | 2,185,519 | 1,271,000 |

Before the earthquake the annual increase in business was between 5 and 6 per cent. In view of present business conditions, $2,246,000 will be accepted as the probable income for the present year. This estimated income will fall short of the required income, as shown above, by $266,675.60. After paying taxes, operating expenses, and depreciation, there will remain a net income of $1,111,000 for the use of complainant's property, or 4.03 per cent. upon the present value of the property in use. This is less than a just and reasonable compensation, and "amounts to the taking of private property for public use without just compensation, thereby depriving the complainant of its property without due process of law." Spring Valley Waterworks v. San Francisco, 124 Fed. 574.

### Preliminary Injunction.

The situation disclosed by the record is novel, to say the least. Such a condition has never presented itself before in the history of this litigation. Hitherto the company has sought to prevent the enforcement of ordinances reducing rates; now it seeks to enjoin the enforcement of an ordinance which raises rates. In previous suits complainant offered to conform to the rates of 1902, and asked permission to collect such rates; thus the court was enabled to judge in advance the effect of its order; but in the bill of complaint now under consideration there is a significant absence of suggestion that the water company is willing to conform to any specified schedule of rates, or that the charges for water, in case an injunction pendente lite is granted, be limited or defined by the court in any manner whatever. Furthermore, it was contended in the argument that this court neither on preliminary injunction nor final hearing has any power to place a limit upon the amount which the company may collect. Without the restraining influence of the ordinance the company can exercise its own judgment as to what is just and reasonable; it can offer to deliver water on its own terms; its customers must either accept those terms or forego the use of water. Complainant has not, in so many words, asked permission to adjust water rates, but it has asked an injunction which this court in the exercise of its discretion may grant or refuse. If refused, the ordinance fixes a limit beyond which the company cannot raise its charges for water; if granted, the ordinance is temporarily annulled, and the company is thereby given a right, which it does not and otherwise cannot enjoy, during the present fiscal year, namely, the right, practically unlimited under present conditions, to fix prices at which it will sell

165 F.—45

water. Freedom to raise water rates is the result, and therefore a part of the injunctive relief sought by complainant, and it must be so regarded. Equity looks at the substance of things; it is the effect, not the mere form of the demanded relief, which must be considered.

We are thus led to the question whether, under such conditions, a court of equity can in the exercise of its discretion issue such an injunction. Defendants contend that by collecting the rates of 1902 for more than five years prior to this suit complainant acquiesced therein, and in the rates which it now seeks to enjoin, and hence, whether the ordinance be valid or invalid, a preliminary injunction should not issue. In Perkins v. Northern Pac. Ry. Co. (C. C.) 155 Fed. 445, after an order of the State Railroad and Warehouse Commission, and also an act of the Legislature of Minnesota reducing freights and fares, had gone into effect and had been accepted and put into operation by the railroad companies, certain stockholders of the railroad company brought suit to restrain further enforcement of the reduced rates, alleging they were confiscatory. Judge Lochren refused a preliminary injunction on the ground that the office of such a writ is to keep matters in statu quo, and ordinarily it should not go beyond that, and it should not go "beyond cases where there is actual fraud; where the person receiving the property has no fair claim of right * * * to the property. If he can show that he has a fair color of right which may be litigated, he ought not to be deprived of an opportunity to preserve the status quo until the matter should be properly determined." And inasmuch as it was claimed, and no doubt honestly, by the authorities, that the rates were adequate and not confiscatory, it was held by Judge Lochren that an injunction could not go against rates which had been accepted by the railroad, and were in operation. It is "a general rule that long acquiescence on the part of a plaintiff in a state of things which he afterwards seeks to have enjoined will constitute sufficient ground for refusing the desired relief." 1 Spelling on Inj. & Extraordinary Rem. § 267, p. 40. But "the acquiescence which will bar a complainant from the exercise in his favor of the discretionary jurisdiction by injunction must be such as proves his assent to the acts of the defendant, and to the injuries to himself which have flowed or can reasonably be anticipated to flow from those acts." Lux v. Haggin, 69 Cal. 255, 271, 4 Pac. 919, 10 Pac. 674. The record shows that complainant has rarely missed an opportunity to protest against the rates of 1902, and to urge both in court and in the board of supervisors that the rates for that year were unjust and insufficient. Furthermore, even though the rates since that year have been constant, the increased outgo for taxes and operating expenses has resulted in a much diminished income to the company. There has been no sufficient acceptance of, or consent to, the rates of 1902, or to its diminishing net income under those rates, to constitute acquiescence on the part of complainant within the legal acceptation of that term.

Defendants insist that the function of a preliminary injunction is to preserve the status quo. They argue that ever since 1902 the company has furnished water at the 1902 rates; that condition is therefore the status quo; to set aside the 1902 rates is to destroy the status quo,

and to maintain those rates is to preserve the status quo; and that "the granting of this preliminary injunction will absolutely destroy the status quo; it will leave the inhabitants of the city, as well as the city officials, entirely at the mercy of this complainant company," and hence it should not issue. On the other hand, complainant says, before this suit no ordinance and no official rates were in force, and consequently the status quo is a condition in which there is no ordinance, no rates fixed by law, and the company is free to regulate its charges by contract with its customers. As the doctrine is usually stated:

"The sole object of an interlocutory or preliminary injunction is to preserve the subject in controversy in its then condition, and, without determining any question of right, merely to prevent the perpetration of wrong, or the doing of an act whereby the right in controversy may be materially injured or endangered. It cannot be used for the purpose of taking property out of the possession of one party and giving its possession to another; nor does it compel the defendant to undo what he has done, as this might injure him as much as his act would injure his opponent. Injunction prevents the further continuance of injurious acts begun, or prevents doing them, if only threatened. It acts only prospectively to preserve things in statu quo until ultimate decision. It does not prejudge without hearing; it does not anticipate ultimate decision, giving decision on the merits and then hearing." 1 High, Inj. §§ 4, 5, 355, 715.

"If a preliminary order restrains one of the parties from interference with the property in dispute and leaves the other free so to interfere, the court will modify such order so as to do equal justice to the parties, and keep the property in statu quo until the determination of the controversy as to title and their respective rights. * * * If it undertakes, or if its effect is, to dispose of the merits of a controversy without a hearing, or if it devests a party of his possession or rights in property without a trial, it is void." 1 Beach, Inj. §§ 110, 112; Bettman v. Harness, 42 W. Va. 433, 441, 26 S. E. 271, 273, 36 L. R. A. 566, 571; Cole Silver Mfg. Co. v Virginia & Gold Hill Water Co., 1 Sawyer, 685, 693, Fed. Cas. No. 2,990; City of Newton v. Levis, 79 Fed. 715, 25 C. C. A. 161; Alaska Ry. Co. v. Copper River Ry. Co. (C. C. A.) 160 Fed. 862; 5 Pom. Eq. Jur. § 264.

If we adopt defendants' conception of the status quo, the injunction will be denied, the ordinance will remain in force, and complainant will collect substantially the rates of 1902. Since 1902, however, conditions have changed; taxes and operating expenses have increased to such an extent that the net income of the company in 1907 was less than the net income in 1902 by about $300,000; and, although the company estimates an increase in its business for this year, the net income of 1902 will still exceed the estimated net income of 1908–09 by $18,808.98. Thus, while the rates are practically the same as in 1902, the net income will probably be less; and this is the condition notwithstanding the fact that during the interval the company, by assessing its stockholders and by the sale of bonds, has raised about $3,000,000, all of which has been expended in repairs or betterments; and notwithstanding the further fact that San Francisco consumed but 10,102,000,000 gallons of water in 1902 as against 11,181,000,000 gallons in 1907. If at the end of one or two years, as the case may be, a final decision is reached, and the ordinance is declared confiscatory, how is the company to recover the difference between what it has collected and what it should have received? Of its 49,000 customers many will have departed, and others will be pecuniarily irre-

708 ·165 FEDERAL REPORTER.

sponsible. George E. Booker, chief clerk of the company, testifies that "one-half of the customers are tenants, who move frequently and have no settled or permanent place of abode." The same section of the Constitution of California which requires the board of supervisors to fix water rates also declares that "any person, company or corporation collecting water rates in any city or county or city or town in this state otherwise than as so established, shall forfeit the franchise and waterworks of such person, company or corporation to the city and county or city or town where the same are collected for the public use." This provision is certainly drastic enough to deter the company, in the absence of an injunction pendente lite, from charging or attempting to collect rates higher than those set out in the ordinance. If the company charges the rate of the ordinance and receives the same without protest, or demand of payment at a higher rate, it would probably be unable to recover anything more, even if the court on final hearing should declare the ordinance invalid and the company entitled to a higher rate. Consolidated Gas Co. v. Mayer (C. C.) 146 Fed. 150, 153. Again, under the Constitution of California and the charter of the city and county of San Francisco, the municipal expenses of any one fiscal year cannot be paid out of the funds and revenues raised for any subsequent fiscal year. The ordinance in question ceases to be effective July 1, 1909. It is highly improbable that a final decree can be had by that time. It is therefore obvious that to maintain the status quo as contended for by defendants is to defeat the very object which equity seeks to accomplish in preserving the status quo. It is also clear that complainant's injury will be irreparable without such an injunction if it prevails on final hearing. To deny the injunction is to deny complainant any substantial relief, and to empty the final decree before it is rendered.

While it appears that the ordinance in question is probably confiscatory, and therefore invalid, the fact that complainant will suffer irreparable injury unless an injunction issues is not decisive. The court owes equal consideration to both parties; it must not issue an injunction which will do more harm to one party than good to the other; it should so preserve the matters in dispute as to protect each party as far as possible from harm. We have no means of knowing the plans of the company; whether it will raise the rates for the remainder of the fiscal year to the full amount of what is alleged to be reasonable—that is, so as to realize an income of more than $3,000,000 net—or whether it will be content with something less. If the ordinance is finally adjudged valid, any collections made in excess of the rates specified therein must be repaid. Such repayment can be secured by a proper bond; but if the ordinance is adjudged confiscatory, and therefore invalid, there is no practicable remedy for the consumer, who, under the necessity of agreeing to the terms offered by the company or foregoing the use of water, contracts to pay and does pay more than is just. His injury is irreparable. It is not sufficient to say that courts will enjoin the unreasonable charges, or that this court will promptly dissolve the injunction, if, pending the suit, complainant abuses the process of the court. Whether the rates so fixed by the

company are reasonable or unreasonable is a question of fact which no court would presume to decide without a hearing, and such a hearing may be long and expensive. Most consumers will consider water of any quality or price cheaper than litigation. Neither conception of the status quo is satisfactory. Neither, if maintained, will afford adequate protection but to one party. If the ordinance is confiscatory, complainant is entitled to an additional sum which will make its compensation just and reasonable. This sum will be lost to complainant if the injunction is denied. On the other hand, if the ordinance is confiscatory and the injunction is granted as prayed for, if complainant exacts a compensation in excess of what is just, the excess will be lost to San Francisco and its inhabitants. Equity, however, has no peculiar concern for the status quo, except that its preservation usually, if not always, accomplishes that which is the object of a preliminary injunction; that object is to preserve the fund, the property, the right, or other thing in dispute, from waste, destruction, or disturbance until the rights and equities of the contending parties can be fully considered and determined. Notwithstanding the fact that the ordinance is probably confiscatory, and that its enforcement should be restrained pending suit in order to save complainant from irreparable injury, an interlocutory injunction, the effect of which is to give complainant the authority, practically without limit, to fix prices at which it will sell water, must be denied for the following reasons:

1. It is an abuse of judicial discretion to issue an injunction which will permit one party to obtain any advantage by acting, while the hands of the adverse party are tied by the writ. Northern Pac. R. R. Co. v. City of Spokane (C. C.) 52 Fed. 428, 430; Lake Shore & M. S. Ry Co. v. Taylor, 134 Ill. 603, 25 N. E. 588; Macon, etc., R. R. Co. v Gibson, 85 Ga. 1, 11 S. E. 442, 21 Am. St. Rep. 135, 147; 1 Beach on Inj § 110 In Macon, etc., R. R. Co. v. Gibson, supra, the court uses this language:

"A court of equity, or a court of law in the exercise of equitable functions, may, and should, always impose just terms as a condition to its interference by interlocutory injunction in behalf of suitors. The granting and continuing of an injunction is not matter of strict right in the parties, but of sound discretion in the judge of the court. In the exercise of such discretion, it seems highly inexpedient to hold one of the parties to the litigation absolutely bound, whilst the other party remains perfectly free. This would have the appearance of subjecting the former to the will, or even the caprice of the latter."

In Northern Pac. Ry. Co. v. City of Spokane, supra, there was a controversy as to the title to a tract of land in the city of Spokane; the city claimed the land was dedicated for a public street, and it was claimed by the railroad as a part of its right of way. The company owned a warehouse which covered a portion of this ground; the ground was also the site of a railroad depot which had been destroyed by fire. The city, claiming that the structures were or would be a nuisance, proposed to tear down the warehouse, and also to prevent the company from rebuilding the depot on any part of the street. A preliminary restraining order was issued. On motion to vacate this order the court held that the destruction of the warehouse should be re-

strained, and that the city could not be enjoined from preventing the rebuilding of the depot on the street, because:

"The purpose of a restraining order pendente lite, in all cases of this nature, is to preserve property which is the subject of controversy in its existing condition until a final hearing and determination of the cause; and the order should be limited so as to simply preserve the status quo, and should not give either party an advantage by proceeding in the acquisition or alteration of property, the right to which is disputed, while the hands of the other party are tied."

2. The court must so exercise its discretion as to safeguard the interests of both parties. Schneider v. New Amsterdam Gas Co., 116 App. Div. 345, 101 N. Y. Supp. 535; Sampson & Murdock Co. v. Seaver-Radford Co. (C. C.) 129 Fed. 761, 773.

3. It is a well-settled doctrine that a preliminary injunction which takes, or has the effect of taking, property out of the possession of one party, and placing it in possession of the other, is improper, because:

"It is not the form but the effect of the order which must be regarded. If it take or permit the taking from a defendant anything he has, it would anticipate and forejudge the merits of the controversy, and transcend, as we have seen, the purposes of a preliminary injunction." Southern Pac. R. R. Co. v. City of Oakland (C. C.) 58 Fed. 50, 54; Calvert v. State, 34 Neb. 616, 52 N. W. 687, 692.

The reasoning on which this rule is based should apply with equal force to an interlocutory injunction, the effect of which will be to restrain the operation of a rate-fixing ordinance adopted by defendants in execution of a power conferred by the Constitution of the state of California, and transfer the power to regulate rates to complainant for the remainder of this fiscal year.

4. The effect of the injunction to the full extent prayed for will be, for all practical purposes, a decree in favor of the complainant in advance of the trial. During the interval which must elapse before final hearing and the end of the fiscal year, the company will be at liberty to exercise and enjoy substantially every right for which it will contend on the trial. If the injunction issues, the complainant has prevailed for the present, without a trial, and at the very beginning of the suit; it need do nothing more than delay the proceedings as much as possible. Such an injunction goes too far, because it gives to the complainant the rights for which it contends in advance of a decision. Trow Directory v. Boyd (C. C.) 97 Fed. 586; Chester Traction Co. v. Philadelphia, 174 Pa. 284, 34 Atl. 619; Calvert v. State, 34 Neb. 616, 52 N. W. 687, 692; Van Veghten v. Howland, 12 Abb. Pr., N. S. (N. Y.) 461; Bettman v. Harness, 42 W. Va. 433, 26 S. E. 271, 36 L. R. A. 566, 570; Ladd v. Flynn, 90 Mich. 181, 51 N. W. 203, 204.

5. It is conceded by both parties that the court cannot on this hearing fix water rates. That power is vested by the Constitution in the board of supervisors. The court is now asked, in view of its own inability to fix rates, in view of the fact that it can give no decision on the merits of the case until final hearing, to clothe this complainant with authority to regulate rates pending suit. Reasonable rates must be based on a decision as to what is the reasonable value of the service, and this may be one of the most vital issues in the suit. Has it

ever been held a proper exercise of judicial discretion in a strenuously contested case to permit one of the parties to decide his own cause in advance of the final decree?

We are confronted with this condition: To refuse a preliminary injunction is to deny complainant all relief. On the other hand, an injunction, unrestricted, as prayed for, will not only ill accord with equitable principles, but will subject water consumers to irreparable loss. If the court could say to the company, keep your water, and to the consumer, keep your rates until this matter is finally adjusted, the solution would be easy, but it is impossible; the people must have water, and the company must continue to supply them. Having once enlisted in the public service, the company cannot withdraw. Though denied relief, the company must continue to perform its part of the contract at a continuing loss, at a loss which is irreparable.

Again, if it be conceded that the 1902 rate is the status quo, and that no interlocutory injunction can issue subverting the status quo, then the 1902 rates must prevail until the end of the case, and the company must continue to furnish water at the rates of 1902. If those rates are unjust to the company, the deficiency in its income will be continuing; each day will add to the deficiency and to the sum total of the company's irreparable loss. This suit may linger in the court for years, as others have. If the board each year re-enacts the 1902 rates until final judgment, and thereafter adopts the same rates, or rates which will yield substantially less than a reasonable compensation, when will complainant be able to escape from the 1902 rates as the status quo, or from such continuing loss, even though the court declares each ordinance confiscatory? If the court attempts to prescribe rates to be collected pending suit, it is at once met with the objection that it has no more power to fix rates than the board has to adjudge a rate-fixing ordinance valid and constitutional; but the court has no less power to deal with rates prescribed by the company than to deal with rates established by ordinance.

It has been established in this proceeding that complainant is probably entitled to a gross income $266,675.60 larger than the present rates will afford, and that such sum will probably be lost if not in some manner protected by the court. This can only be accomplished by so prohibiting the enforcement of the ordinance that complainant may collect the additional amount from its customers. So much relief complainant ought to have, but no more. This court is bound to gauge with even hands its interlocutory relief by the circumstances, conditions, and rights which have appeared, to the end that each party shall suffer the minimum of injury. But at this time in these proceedings, under what principle can an order be justified by which the court says, in effect, to complainant, "You are entitled to so much relief; this the court deems just and reasonable; you will not only be permitted to take this, but you will be put in such a position that you can take as much more as you think reasonable." True, this court cannot fix water rates, but it can require each suitor who seeks equity to do equity, or go away empty.

If an interlocutory injunction issues without restrictions, water rates will be arranged by contract between complainant and its customers.

It is urged that any such restrictions would be improper because they would violate complainant's right of contract, which also is protected by the federal Constitution. It is unnecessary at the present time to define complainant's contractual rights under the ordinance when it is in force. It is sufficient to say that the company cannot fix prices in excess of those specified in the ordinance, which consumers must accept or otherwise forego the use of water; nor can it enjoy or exercise any such right during the present year and pending this suit, except as the result of an exercise of judicial discretion by this court in behalf of the company. This is not a case where the Constitution has left to the Legislature or to the board of supervisors the power and discretion to decide when water-rate regulation is necessary and proper, in addition to the power and discretion to regulate such rates. Under such a law when the rate-fixing agency, presuming such regulation is unnecessary, has failed to act, the water owner and the water consumer may contract freely. This is what is decided in Fresno Canal, etc., Co. v. Park, 129 Cal. 437, 62 Pac. 87; but here there is no presumption that regulation is unnecessary; the Constitution has declared the necessity of regulation, and under severe sanctions requires the board to fix rates each year. If now the court in its discretion sees fit to grant an injunction pending the suit, under conditions which limit complainant's liberty to exact rates, it is simply defining the privilege which it confers, not curtailing a right. "As to the power of a court of equity to impose any terms in its discretion as a condition of granting or continuing an injunction, there can be no question." Meyers v. Block, 120 U. S. 206, 214, 7 Sup. Ct. 525, 529, 30 L. Ed. 642. "In balancing the comparative convenience or inconvenience from granting or withholding an injunction, the court will take into consideration what means it has of putting the party who may be ultimately successful in the position he would have stood if his legal rights had not been interfered with. The court may often by imposing terms on the one party, as the condition of either granting or withholding the injunction, secure the other party from damage in the event of his proving ultimately to have the legal right." Kerr, Inj. 28. The court "will take care so to frame its order as not to deprive either party of the benefit he is entitled to, if in the event it turns out that the party in whose favor the order is made shall be in the wrong." Id. 27; Russell v. Farley, 105 U. S. 433, 439, 26 L. Ed. 1060; Great Falls Mfg. Co. v. Henry, 25 Grat. (Va.) 575; Guttenberger v. Woods, 51 Cal. 523.

It is insisted on behalf of complainant that the preliminary injunction demanded here is in form precisely like the injunction issued in the suits of 1903, 1904, and 1905, between the city and the water company. This is true, but the conditions are strikingly different. In those cases the purpose was to restrain the city from enforcing an ordinance reducing water rates; here the ultimate purpose is to so restrain the city that the company may raise its rates. In those cases the complainant, with becoming deference to the great principle that he who seeks equity must do or offer to do equity, came into this tribunal offering to conform to the water rates of 1902, and asking an order permitting those rates to be collected. Here the only intimation

contained in the complaint, if it may be considered an intimation, as to the measure of rates to be collected during the controversy, is the allegation that complainant is justly entitled to an annual income of more than $3,000,000 net. In Consolidated Gas Co. v. Mayer (C. C.) 116 Fed. 150, two acts of the Legislature and an order of the gas commission reducing gas rates from $1 to 80 cents per 1,000 cubic feet were attacked. An interlocutory injunction was issued in which it was provided "that the gas company might charge or demand payment at the old rate, and might collect at that rate from such as choose to pay" It also provided that the difference so collected between the old rate and the new rate should be impounded under direction of the court so as fully to insure its return to the person paying the same, in the event of the company's failing to succeed in its litigation. A similar order was made in Buffalo Gas Co v. City of Buffalo (C. C.) 156 Fed. 370 The gas company asked "leave of the court to issue to its customers bills or demands for gas consumed each month at the rate of $1 per 1,000 feet, the difference between such sum if paid by the customer and the amount fixed by the commission to be impounded until the controversy may be determined" The order was so made, but with the provision "that the customer may have the option of paying the higher or lower rate" An order will follow this decision providing that an injunction pendente lite issue; that complainant be permitted, under certain restrictions and limitations, to arrange its prices for water, delivered during the time said injunction remains in force, by contract with its customers; that all compensation for water collected in excess of the rates specified by the ordinance in question be impounded to await the final decision or further order of this court; and that complainant execute an undertaking in the sum of $100,000 to answer for damages, and to insure its prompt and faithful obedience to such order.

I am aware that impounding such funds will occasion much inconvenience, but I believe such inconvenience will be counterbalanced by the additional assurance to consumers of prompt, equitable, and gracious distribution, in case it be finally decided that such moneys, or any portion of them, ought to be returned. Another and weightier reason prompts such a course. On a preliminary motion like this the testimony is not ripe for final consideration, and there is of necessity a wide margin of uncertainty. The court should therefore proceed with caution, and, if it retains control of these funds until final decree, it will then be possible to correct any errors which may have been made, without serious loss to any one who may be injured by said order, and it will be possible to maintain such fund intact until the imperfections and errors of this proceeding and in this court are corrected by the Court of Appeals.